

DA 11-0254

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 317

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

BENNY ROE STEWART,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DC-09-194
Honorable Brad Newman, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Colin M. Stephens, Smith & Stephens, P.C., Missoula, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General, Matthew T. Cochenour,
Assistant Attorney General, Helena, Montana

          Eileen Joyce, Butte-Silver Bow County Attorney, Samm Cox, Kelli Fivey,
Deputy County Attorneys, Butte, Montana

Submitted on Briefs:  July 18, 2012

Decided:  December 27, 2012

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      A jury in the Second Judicial District Court, Silver Bow County, convicted Benny Roe Stewart of one count of incest.  Stewart now appeals, seeking to have his conviction reversed and vacated and the case remanded for a new trial.  Stewart raises the following issues on appeal:

1.  Whether Stewart is entitled to a new trial due to law enforcement's warrantless monitoring and recording of his telephone conversations with his daughter.

2.  Whether the District Court abused its discretion in admitting sexually oriented photographs which Stewart took of his daughter.

We affirm.

## BACKGROUND

### The Sexual Abuse and Reporting

¶2      The jury convicted Stewart of sexually molesting his daughter, A.S., over a period of 11 years, from 1998 to 2009.  A.S. testified at trial concerning the abuse.  She stated that the sexual contact began when she was 7 years old and continued through her high school years.  She could not remember each individual contact "because there's so many they run together."  When A.S. was younger, Stewart would touch and fondle her vagina with his fingers.  As A.S. grew older, Stewart also touched her buttocks and fondled her breasts.  Stewart would have A.S. masturbate in front of him, and he would touch her while she was doing this.  Stewart performed oral sex on A.S. and forced her to perform oral sex on him.  When A.S. was 9 years old, Stewart inserted his penis partway into her vagina.  During her teenage years, the sexual contacts between Stewart and A.S. occurred "every other day."  Stewart told A.S. that she was sexy and that he wanted her to be his

2

own. A.S. testified that Stewart treated her more as his "lover" than as his daughter. Stewart told A.S. that their sexual activities were "okay" and "normal" and that other fathers did these sorts of things with their daughters. If A.S. resisted, Stewart used guilt, coercion (e.g., refusing to allow her to spend time with friends), and other manipulation (e.g., shunning and refusing to speak to her) to get A.S. to have sex with him.

¶3 Stewart took photographs of A.S. in varying states of undress and in sexually provocative poses that he orchestrated. This began around age 15. Stewart had A.S. dress in different outfits, including a bikini, some lingerie, and a flight attendant costume. One set of photographs, approximately 90 in number, was taken in a hotel room in Salt Lake City on A.S.'s 18th birthday. This collection includes pictures of A.S. nude and close-ups of her vagina.

¶4 When A.S. turned 18, she joined the Army National Guard. A.S. initially reported the sexual molestation to her drill sergeant. She later met with Lieutenant Ed Lester, a detective with the Butte-Silver Bow Law Enforcement Department. She provided Lester with various details: that the abuse had been ongoing for the previous 11 years; that it consisted of fondling, masturbation, oral sex, digital penetration, and penile penetration; and that Stewart had taken nude and sexually provocative photographs of her. A.S. stated that the photographs could be found on computers at the family residence. In addition, she advised Lester that her parents had purchased some sex toys for her, which could be found in her bedroom at the residence.

¶5 Detective Lester obtained a search warrant for the Stewart residence to seize the computers and the sex toys. During the search, Lester spoke with J.S. (A.S.'s older

3

brother), who thereafter came to the police station and gave a statement corroborating A.S.'s complaint. After seizing the computers, Lester obtained a warrant to search the internal data on the computers.

### The Pretext Calls

¶6 At the time A.S. reported the sexual abuse to law enforcement, Stewart and his wife, Angelina, were out of town. Detective Lester thus spoke with A.S. about making some "pretext phone calls" to Stewart's cell phone. Lester explained at trial that "[a] pretext call is a tool we use in investigation. Sometimes when we've been able to speak to the victim and sometimes witnesses, and sometimes we have the victim call the suspect and we record that phone call serendipitously [sic] so the suspect does not know he's being recorded and -- in hopes of obtaining more information." A.S. agreed to make the calls. Due to the Caller ID on Stewart's cell phone, Lester went to the Stewart residence and connected his listening and recording equipment to the landline there. Lester then had A.S. make the calls from that location, rather than from her cell phone. Lester did not obtain a search warrant to surreptitiously monitor and record the conversations between A.S. and Stewart.

¶7 The calls took place November 6, 2009. There were four in total, three from A.S. to Stewart and one from Stewart to A.S., which are summarized below. At the time, Stewart and Angelina were in transit (driving) from Wyoming, where Stewart had been searching for a job, back to their residence in Butte.

¶8 A.S. commenced the first call, which lasted 17 minutes and 30 seconds. Angelina answered the phone and then handed it to Stewart. At the outset, A.S. confronted Stewart

4

about restrictions he had imposed on her personal life and about recent threats he had made to "rape" her and throw her out of the house. She then got into the sexual abuse and asserted that she was not going to be his "little play toy" anymore. Stewart was seemingly caught off guard. He stated that he had "no clue what brought all this up." He did not expressly acknowledge A.S.'s references to the molestation, but he did not refute them either. Many of his responses were vague and evasive—apparently, as A.S. opined, because Angelina was present. A.S. asked Stewart why he continued to demand "sexual favors" from her after having told her that he would stop. Stewart responded, "Okay, uh, that's a done deal." A.S. questioned his sincerity, however, and pressed on with the discussion of the abuse. Finally, after several minutes of this, Stewart, sounding quite frustrated, gave her an ultimatum: either "shut up and leave me alone" or "you're out of there." He stated that if A.S. wanted to stay at the house, she needed to "be reasonable, respectful, and mindful." When A.S. asked whether he would promise to quit "the sexual stuff," Stewart replied, "Uh, you and I will discuss that, uh, at a later date."

¶9 Stewart ended the first call because he was stopping at a gas station. He called A.S. back for the second call, which lasted roughly 26 minutes and 30 seconds. Angelina was outside the vehicle during the first several minutes of this call, but it seems that she and Stewart resumed their drive to Butte at some point during the call. At the outset, A.S. reiterated that she was "tired of the sexual favors" because "it's my body, it's not your body." Stewart stated, "Okay. Are you tired of it?" and A.S. replied, "Yes." Stewart then stated, "Okay, it's done. It's that simple." The conversation turned briefly to a discussion of how A.S. felt that Stewart was trying to "control" every facet of her

5

life—personal and financial decisions in particular. A.S. then brought the conversation back to the abuse. She asked Stewart to explain why he had molested her. She stated that she did not enjoy it when he "went down on" her. She said she felt that he had taken something from her by forcing her to have sex with him. Stewart remained evasive and observed that A.S. was behaving oddly: "This is not you." He again threatened to throw her out of the house if she did not have "a smile and a different frame of mind" when he got home. A.S. persisted, however, and repeatedly asked Stewart to promise not to touch her anymore—to the point that Stewart became audibly upset and stated that if she pushed the matter any further, her life would be "going straight to hell." He did not deny the abuse; he simply stated that he had already given an answer to her question and did not want to discuss the matter any further. A.S., nevertheless, insisted that Stewart should reveal the abuse to Angelina, to which Stewart finally replied, "When I get home, everything that we talked about will be totally out in the open and talked about, and you're done, you're out of our lives."

¶10 It appears the second call either was dropped due to bad reception or that Stewart hung up. A.S. called him back and ended up leaving a short voicemail message. She apologized that the conversation had "gotten out of hand" and asked him to call her.

¶11 Sometime later, A.S. called Stewart again for the fourth and final pretext call, which lasted about 16 minutes. Noting that A.S. had said she "wanted everything out in the open," Stewart told her that he had been talking to Angelina and that "Mom knows that I, uh, went down on you the other day." A.S. asked to speak with Angelina. When Angelina came on the line, A.S. asked her what she thought about the things Stewart had

6

done to A.S. In response, Angelina stated, "What have you done to him? You've done the same thing, over and over and over and over. . . . You flaunt it out in front of him." Angelina refused to accept that Stewart had forced A.S. to engage in sex with him. Angelina stated that Stewart had been merely "willing" to do so. Stewart then came back on the line. A.S. asked him whether he was afraid that she would tell someone. She implied that she might call the police. Stewart became angry with A.S.'s "threats" and eventually stated, "You can tell anybody you want to tell. I have no regrets with you. I have not done anything, uh, to you." A.S. pointed out that Stewart had "violated" her body, but he replied that she had touched him too. When A.S. stated that he had coerced her into having sex with him, Stewart asserted that she was "really screwed up." A.S. then asked, "When I was little, like seven, it was my idea to have fun with you?" Stewart responded, "Yeah." A.S. then brought up the photographs. Stewart admitted that he had taken nude pictures of her. But when A.S. accused him of molesting her and taking the photographs for his own pleasure, Stewart challenged her to "[p]rove it!"

**Motion in Limine to Exclude the Photographs**

¶12 The State charged Stewart with one count of incest, a felony, in violation of § 45-5-507, MCA. The State alleged that the sexual contact occurred as a continuing course of conduct between January 1998 and November 2009. The State noted that it would be seeking a mandatory minimum sentence based on the age difference between Stewart and A.S. *See* § 45-5-507(4), (5), MCA.

¶13 The prosecution indicated before trial that it intended to introduce the photographs of A.S., including those in which she was completely nude or in sexually explicit poses.

Stewart filed a motion in limine to exclude this evidence. He noted that his defense theory at trial would be "that his daughter is lying because she has a problem with Benny Stewart and her mother, Angie Stewart." Stewart argued that the photographs were irrelevant because there was no evidence of sexual contact when the photos were taken. Alternatively, he argued that even if relevant, the photographs should be excluded because "the prejudicial effect of these photos outweighs any probative value that they might have." The District Court denied the motion. The court's reasoning will be discussed under Issue 2 below.

**Trial**

¶14 The case proceeded to trial, at which time A.S. testified about the years of sexual abuse she had endured from age 7 until she was nearly 19. She stated that Stewart had fondled her vagina "[a]s many times as I can count," had performed oral sex on her about five times, had forced her to perform oral sex on him about two times (she refused to do so on other occasions), and had inserted the head of his penis into her vagina one time. A.S. testified that the sexual contact with Stewart became a "normal part" of her life. As part of her nightly routine, Stewart would have A.S. come into his bedroom and, while Angelina slept next to him, he would (as A.S. testified) "stick his fingers in my vagina before I went to bed so he can masturbate before he went to bed."

¶15 J.S. (A.S.'s brother) also testified at trial. He described Stewart's relationship with A.S. as "a mix between a lover and a father." He stated that Stewart had told him fantasies about "[h]ow he would like to romance [A.S.], how he would like to, given different circumstances, how he would like to bang her, [and] how . . . he loved it when

8

she was nude." J.S. testified that it was common for Stewart and A.S. to lie together on family movie nights and that it appeared (from what J.S. could see) that Stewart often massaged A.S.'s breasts and crotch. J.S. stated that Stewart had shown him photographs of A.S. topless or nude, as well as a photo of A.S. performing oral sex on Stewart when she was 13 or 14 years old. Stewart told J.S. that this was "a family thing" and "not a thing to be ashamed of" because a lot of families do it, but that J.S. nevertheless should "[k]eep your mouth shut . . . and just keep it in between all of us."

¶16 Angelina testified. She stated that she had suspected "something was going on" between Stewart and A.S. through the years, but when she questioned them about it, they denied it. Angelina acknowledged that at night, before going to bed, A.S. would come into the bedroom and give her parents a hug and then lie next to Stewart, who generally slept naked. When asked whether she did anything to protect A.S. in these situations, Angelina stated: "I would put my hands on his private, his -- his penis. Sometimes it's soft, sometimes it's halfway hard." In regard to the pretext telephone calls, Angelina stated that Stewart had admitted to her (between the second and fourth calls) that "he went down on [A.S.]," which Angelina took to mean "[w]ent down on her private." Angelina testified that upon learning of this, she felt angry at both Stewart and A.S. She stated that she could now understand why A.S. "was mad all the time."

¶17 Agent Jimmy Weg with the Montana Division of Criminal Investigation testified regarding his examination of the computers seized from Stewart's residence. In addition to the photographs he found, Weg discussed the Internet browsing history, which included sites such as "Daddy's Whore.com" and "FirstDaddysLesson.com – Tricky dads

9

seduces their trusting daughters." Weg acknowledged, however, that he could not identify who was operating the computer at the times these sites were accessed.

¶18 Stewart testified in his defense. He stated that he never had sexual contact with A.S. He asserted that A.S. had been a "difficult daughter." He theorized that A.S. had fabricated the allegations out of "extreme anger" toward him, Angelina, and J.S. Stewart posited that A.S. was upset with him for "my refusal to repair her car or produce the funds to repair her car, along with the date canceling, then the -- for those reasons. It was not unusual for [A.S.] to fly into me and just say all kinds of things that didn't make sense to anybody." Stewart denied that he had visited the incest websites. He theorized that Angelina, J.S., or A.S. must have done so out of their own "fascination with father and daughter sex." Stewart characterized the photographs of A.S. as "family photos"—like photos a mother would take of a small child in a bathtub. These included photos of Stewart lifting up A.S.'s dress and looking at her buttocks, and of A.S. licking her own breasts. Stewart admitted that he had taken sexually graphic photos of A.S. on her 18th birthday, including close-ups of her vagina, but he claimed that he did so at her request and to please her. He asserted that no incest had occurred. As for the pretext phone calls, Stewart testified that, in his opinion, he did not admit to any sexual contact with A.S. during those conversations. Although he had acknowledged "touching" A.S., Stewart stated that he did not use the word "touch" to mean "sex." Stewart likewise testified that when he told Angelina that he "went down on" A.S., he did not mean oral sex. Instead, he was referring to an incident when he and A.S. were on a trip to Alaska and she apparently had a bad reaction from drinking too much coffee. According to Stewart, A.S.

10

"went into a type of mental state or, I guess you would say, a type of seizure or fit," and he used the term "went down on [A.S.]" to describe this incident to Angelina.

¶19  Without objection, the State played the recordings of the pretext telephone calls to the jury. The parties thereafter argued differing interpretations of the conversations. In the prosecutor's view, Stewart implicitly admitted the crime: "There's a complete lack of denial when she's pressing him over and over about the sexual favors and 'you touched my body.' And think about the lack of surprise. There is no shock in his voice that he's being accused of touching his daughter. That is completely absent from these phone calls." Stewart, conversely, emphasized that he did make denials of A.S.'s allegations:

> The State relies upon these . . . recorded telephone conversations . . . as implicit admissions. Even in the . . . recordings that they played, there were denials by Benny Stewart. "I haven't touched you. I haven't violated you. I haven't done this, that or whatever." You can listen to the recordings, you can assess whether those are implicit admissions or not. They contend that he did not deny that these things happened. He expressly denied them toward the end. "I didn't do anything. I didn't violate you. You touched me, I touched you." Of course they touched each other. But not in the manner that the State contends. Not sexual contact.

Stewart maintained that "[t]hey haven't come up with any concrete evidence whatsoever of sexual contact between Benny Stewart and his daughter [A.S.], even the -- even the recorded telephone conversations."

¶20  The District Court instructed the jury that a person commits the offense of incest if he knowingly has sexual intercourse with or has sexual contact with a descendant. Apart from this instruction, the District Court directed the jury that, if it first determined beyond a reasonable doubt that Stewart had committed the offense of incest, then it had to decide "[w]hether the Defendant's victim was under the age of 16 and the defendant was 3 or

11

more years older than the victim." *See* § 45-5-507(4), MCA. The court made it clear that this was "a separate finding by you, independent of the issue of whether the Defendant is guilty of the offense of INCEST," and had to be "separately stated on the verdict form." The jury ultimately found, on September 1, 2010, that Stewart was guilty of incest and that an act of sexual intercourse or sexual contact occurred when A.S. was under 16 years of age and Stewart was 3 or more years older than her.

**Motion for New Trial**

¶21 After the guilty verdict, but before the scheduled November 18, 2010 sentencing hearing, this Court issued its decision in *State v. Allen*, 2010 MT 214, 357 Mont. 495, 241 P.3d 1045, holding that law enforcement's warrantless monitoring and recording of the defendant's cell-phone conversation violated his rights under the Montana Constitution and should have been suppressed. *Allen*, ¶¶ 32-65. Based on *Allen*, Stewart filed a motion for a new trial challenging the admission of the telephone recordings in his case.

¶22 The District Court denied the motion on three separate grounds. First, the court reasoned that Angelina's presence in the vehicle throughout most of the conversations vitiated any expectation of privacy Stewart might have had in the conversations, and thus there had been no *Allen* violation. Second, the court concluded that Detective Lester had complied with then-existing (i.e., pre-*Allen*) caselaw and acted in good faith with respect to his warrantless recording of the calls, and thus the exclusionary rule would not have applied in any event. Third, the court reasoned that any error in the admission of the recordings was harmless. The District Court sentenced Stewart to the Montana State Prison for 50 years, with 20 years suspended. Stewart now appeals.

12

**STANDARDS OF REVIEW**

¶23 A trial court's decision on a motion for a new trial is reviewed for abuse of discretion, *State v. Dunfee*, 2005 MT 147, ¶ 14, 327 Mont. 335, 114 P.3d 217, unless the specific issue requires a different standard of review, *State v. Ariegwe*, 2007 MT 204, ¶ 164, 338 Mont. 442, 167 P.3d 815. A trial court's decision that a defendant is not entitled to a new trial as a result of the retroactive application of a new rule for the conduct of criminal prosecutions is a question of law, which is reviewed de novo. *State v. Reichmand*, 2010 MT 228, ¶ 13, 358 Mont. 68, 243 P.3d 423. Questions of constitutional law are likewise reviewed de novo. *State v. Kingman*, 2011 MT 269, ¶ 38, 362 Mont. 330, 264 P.3d 1104. Lastly, a trial court's ruling on evidentiary matters is generally reviewed for an abuse of discretion; however, to the extent the trial court's ruling is based on an interpretation of an evidentiary rule or statute, the ruling is reviewed de novo. *State v. Sage*, 2010 MT 156, ¶ 21, 357 Mont. 99, 235 P.3d 1284.

**DISCUSSION**

¶24 ***Issue 1. Is Stewart entitled to a new trial due to law enforcement's warrantless monitoring and recording of his telephone conversations with his daughter?***

¶25 The parties argue three sub-issues relating to the broader question of whether Stewart is entitled to a new trial. We shall address each one in turn.

**A. Is Stewart entitled to the benefit of a change in the law applicable to the warrantless monitoring and recording of telephone conversations?**

¶26 As a threshold matter, we first address the State's argument that Stewart is not entitled to the benefit of our decision in *Allen*. Several of this Court's pre-*Allen* cases condoned the warrantless electronic monitoring and recording of telephone conversations

by law enforcement with the consent of one party, so-called "warrantless participant recording." *See Allen* ¶¶ 35-43 (discussing these cases). The *Allen* Court overruled this line of cases based on the recent decision in *State v. Goetz*, 2008 MT 296, 345 Mont. 421, 191 P.3d 489, and held that warrantless participant recording is subject to the strictures of Article II, Sections 10 and 11 of the Montana Constitution. *Allen*, ¶¶ 44-46. If Stewart is not entitled to the benefit of this holding, then there is no need to address whether the warrantless recording of the four pretext calls at issue here violated his rights under *Allen*.

¶27 On one hand, the State acknowledges this Court's decision in *Reichmand*, which involved a procedural situation essentially identical to Stewart's. After the jury found Reichmand guilty, but before his scheduled sentencing hearing, this Court issued its decision in *Goetz*. The *Goetz* case was factually and legally similar to Reichmand's case: both involved warrantless electronic surveillance of the defendants by means of a confidential informant or undercover agent equipped with a transmitting device which enabled officers to surreptitiously monitor and record the conversations between the defendant and the informant/agent. The recordings were played at Reichmand's trial. Thus, following the issuance of *Goetz*, Reichmand filed a motion to set aside the jury's verdict on the ground that the recordings had been unlawfully obtained pursuant to *Goetz*. The district court denied the motion, but this Court reversed. The Court held, first, that by raising the issue through his motion to set aside the verdict, Reichmand properly preserved the issue for appellate review. *Reichmand*, ¶¶ 8-12. The Court then held that *Goetz* applied retroactively to Reichmand's case because *Goetz* announced a new rule and because Reichmand's case was pending on direct review. *Reichmand*, ¶¶ 13-15.

Finally, the Court held that the admission of the electronic recordings constituted trial error and that this error was not harmless. The Court thus reversed Reichmand's conviction and remanded for a new trial. *Reichmand*, ¶¶ 17-27.

¶28 The State concedes that "*Allen* imposed a new obligation on the State" and that, pursuant to *Reichmand*, "Stewart could attempt to seek relief under *Allen*." Yet, the State then argues that even if there was an *Allen* violation here, Stewart is not entitled to relief because Detective Lester acted in reasonable reliance on pre-*Allen* authority when he made the warrantless recordings. In other words, the State maintains that Lester's failure to comply with the new obligation imposed on the State by *Allen* should not be grounds for granting Stewart a new trial, since that obligation did not exist when Lester monitored and recorded the conversations at issue. In this regard, the State contends that "Lester's reliance on the [pre-*Allen*] line of cases was objectively reasonable, and he conducted his investigation in good faith." The State asserts that probable cause existed to apply for a warrant to record the pretext calls and that, "[h]ad *Allen* been the law, Detective Lester would have obtained a warrant." The State argues that "the entire investigation was conducted in compliance with precedent, including the warrants for the home and the computers and the recordings of phone conversations." The State thus concludes that the suppression of any evidence obtained here in violation of *Allen* would not serve the exclusionary rule's purpose of deterring improper police conduct because "Lester's actions were proper under then-governing law."

¶29 The record supports the State's contention that Detective Lester made efforts to comply with extant law by obtaining search warrants for the residence, the computers,

15

and the data thereon. Our decision here is not intended to impugn Lester's efforts or to suggest that he needs to be "penalized" for failing to comply with a legal rule that this Court had not yet announced. Nevertheless, we cannot adopt the good-faith exception the State proposes, as to do so would undermine the very retroactivity principles that the State concedes apply here.

¶30    As the Court reaffirmed in *Reichmand*, a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases pending on direct review or not yet final. *Reichmand*, ¶ 14. This rule is, in fact, mandated by the Supreme Court. *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S. Ct. 708, 716 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past."). Application of a "good faith" exception grounded in the exclusionary rule's deterrence purpose would, in this context, negate the foregoing retroactively rule. Indeed, this argument was considered, and rejected, in *United States v. Johnson*, 457 U.S. 537, 102 S. Ct. 2579 (1982). There, the government argued that new constitutional rules should be given retroactive effect only where law enforcement officers failed to act in good-faith compliance with then-prevailing constitutional norms. The Supreme Court observed, however, that because cases involving simple application of clear, preexisting constitutional guidelines raise no questions of retroactivity at all, the government's theory "would automatically eliminate all [constitutional] rulings from consideration for retroactive application." *Johnson*, 457 U.S. at 559-60, 102 S. Ct. at 2592. Likewise, in concluding that even a new rule marking

16

a "clear break" with past precedent must be given retroactive application to cases that are not yet final, the Supreme Court in *Griffith* rejected prior precedents under which "reliance by law enforcement authorities on the old standards" dictated a finding of nonretroactivity. 479 U.S. at 324-25, 326-27, 107 S. Ct. at 714, 715 (internal quotation marks omitted). The Supreme Court emphasized that all defendants whose cases are pending on direct review or not yet final must be treated the same in the sense that they are all entitled to have newly announced constitutional rules applied to their cases. *Griffith*, 479 U.S. at 327-28, 107 S. Ct. at 715-16; *see also Reichmand*, ¶¶ 11-12.

¶31 For these reasons, we hold that regardless of Detective Lester's good-faith reliance on extant caselaw, Stewart is entitled to have this Court's holding in *Allen* applied to his case, with the result that if there was indeed an *Allen* violation, then Stewart is entitled to relief for that violation—i.e., a new trial in which the challenged evidence is excluded—unless the *Allen* violation was harmless. *Cf. Reichmand*, ¶ 15 ("The District Court erred in determining that *Goetz* was not retroactively applicable to Reichmand. We must next determine whether this error requires a reversal of Reichmand's conviction.").

**B. Was there an *Allen* violation in Stewart's case?**

¶32 The Montana Constitution provides, in pertinent part, that "[t]he people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures." Mont. Const. art. II, § 11. Furthermore, the right of individual privacy, being essential to the well-being of a free society, "shall not be infringed without the showing of a compelling state interest." Mont. Const. art. II, § 10. "We address Article II, Section 10 in conjunction with Article II, Section 11 in analyzing and resolving a search

17

or seizure issue that specifically implicates the right to privacy." *Goetz*, ¶ 14. Moreover, " '[i]n light of the constitutional right to privacy to which Montanans are entitled, we have held that the range of warrantless searches which may be lawfully conducted under the Montana Constitution is narrower than the corresponding range of searches that may be lawfully conducted pursuant to the federal Fourth Amendment.' " *Goetz*, ¶ 14 (brackets in original) (quoting *State v. Hardaway*, 2001 MT 252, ¶ 35, 307 Mont. 139, 36 P.3d 900); *accord Allen*, ¶ 47 ("Read together, Sections 10 and 11 provide robust protection to people in Montana against government intrusions.").

¶33 To determine whether state action constitutes an unlawful search, this Court undertakes a three-part analysis:

> First, we determine whether the person challenging the state's action has an actual subjective expectation of privacy. Second, we determine whether society is willing to recognize that subjective expectation as objectively reasonable. . . . [If these two requirements are met], then the police conduct constitutes a search, subject to constitutional safeguards. We then consider the third step: whether the state action was justified by a compelling state interest or was undertaken with procedural safeguards such as a properly issued search warrant or other special circumstances.

*Allen*, ¶ 47 (citations and internal quotation marks omitted); *accord Goetz*, ¶ 27.

¶34 It must be noted, at this juncture, that the first two elements of the foregoing test were adopted from Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 516 (1967), where he opined that a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable. *See State v. Cotterell*, 2008 MT 409, ¶¶ 26-27, 347 Mont. 231, 198 P.3d 254; *Kyllo v. United States*, 533 U.S. 27, 32-33, 121 S. Ct. 2038, 2042-43 (2001). The

18

Supreme Court recently clarified, however, that *Katz*'s reasonable-expectation-of-privacy test is not the "exclusive" test for determining whether a search has occurred. *United States v. Jones*, ___ U.S. ___, 132 S. Ct. 945, 953 (2012). The *Katz* test augmented, but did not displace or diminish, other tests. *See Jones*, 132 S. Ct. at 950-52 (applying "the common-law trespassory test," rather than the *Katz* test, where the government attached a GPS tracking device to the defendant's vehicle and used it to monitor the vehicle's movements on public streets); *see also Jones*, 132 S. Ct. at 954-55 (Sotomayor, J., concurring). Since the federal Constitution establishes the floor of constitutional rights, *State v. Ariegwe*, 2007 MT 204, ¶ 35, 338 Mont. 442, 167 P.3d 815, and because we must guarantee the minimum rights established by the United States Constitution, *State v. Martinez*, 2003 MT 65, ¶ 51, 314 Mont. 434, 67 P.3d 207, it is important to acknowledge the foregoing clarification in *Jones*. Having done so, we note that the present case does not involve the allegation of a "trespassory" search. Moreover, this is not a case in which the defendant argued an alternative "search" test in the trial court. Rather, the defendant here seeks retroactive application of the rule announced in our intervening *Allen* decision, which applied the *Katz* test. We accordingly proceed to apply that test.

¶35 The crux of the parties' dispute concerns the first factor: whether Stewart had a subjective expectation of privacy in his telephone conversations with A.S. In arguing this question, the parties focus on our corresponding analysis in *Allen*. The Court concluded there that Allen had a subjective expectation of privacy in his cell-phone conversation with Golie, the confidential informant, for several reasons. For starters, Allen did not know that the conversation was being recorded; to the contrary, he believed it was

19

private. He believed that Golie was not using the speaker-phone function on her phone and that no third party was using an extension line to listen in. Moreover, the recording evidenced Allen's desire to keep the substance of his conversation away from any prying ears of the general public. First, since the conversation was telephonic, half of it was entirely inaudible, making the substance of the conversation poorly intelligible to any outside listener. Second, Allen was moving while conversing with Golie, and it was highly unlikely that any listener could glean any intelligible information from overhearing a passing snippet spoken by Allen. Third, during the brief intervals when background voices were audible in the recording, Allen limited his speech to innocuous platitudes, conveying no information about the topics that he and Golie were discussing. All of this led the Court to conclude that "[t]he degree of police intrusion into Allen's privacy by electronically recording the conversation far exceeded the degree to which Allen knowingly exposed this conversation to the public (passing snippets)." *Allen*, ¶ 49.

¶36    The State maintains that Stewart's case is distinguishable from *Allen*. First, the State argues that Stewart did not strive to keep his conversations private but, instead, "knowingly exposed them to a third party, Angelina, who was present in the vehicle." The State recognizes that a third party's presence, alone, does not necessarily extinguish a privacy expectation. *Allen*, ¶¶ 48-49. The State further acknowledges that, similar to the facts of *Allen*, Angelina initially heard only Stewart's half of the conversations and Stewart initially spoke in general terms (thus indicating a desire to keep certain aspects of the conversation private). The State, however, argues a distinction between *Allen* and the present case: whereas Allen moved about while talking with Golie, and it was unlikely

20

that any listener could glean any intelligible information from overhearing a passing snippet, Angelina was present for the vast majority of the conversations and, thus, "potentially could 'glean . . . intelligible information' about the substance of Stewart's conversations" (ellipsis in original). Second, even if Stewart did have an expectation of privacy at the outset, the State contends that he "relinquished any privacy expectations in the conversations when he told Angelina their substance and subsequently involved her."

¶37 Stewart, conversely, maintains that he had a subjective expectation of privacy in his conversations as evidenced by the fact that he, at least initially, kept his answers "vague" and did not address any of A.S.'s allegations of sexual misconduct "in any type of specific terms." Indeed, having listened to the recordings, which are contained in the record, it does appear that Stewart, during the first call and parts of the second, attempts with his vague and evasive responses not to reveal the content of the conversation insofar as the sexual abuse is concerned. This is contrasted with his frankness when topics such as finances, dating, and other areas of disagreement are discussed. Notably, Angelina testified at trial that she was "shock[ed]" when Stewart told her, between the second and fourth calls, that he "went down on" A.S. Angelina stated that she felt angry because she had "just found out" that her husband had engaged in a sexual act with their daughter. This further supports Stewart's claim that he, at least initially, maintained an expectation of privacy in the conversations related to the topic of sexual abuse.

¶38 At this point, it is necessary to identify the specific privacy expectation at issue here. Whatever expectation of privacy Stewart may have had in his conversations with A.S., it could *not* include, for purposes of *Allen*, the expectation that the conversations

21

would be kept secret and never repeated. The *Allen* Court excluded law enforcement's *recording* of Allen's conversation with Golie, but declined to exclude Golie's *testimony* about what Allen had said during that conversation. *Allen*, ¶ 65 & n. 2. In fact, the Court did so despite arguments by the concurring and dissenting opinions that, logically, *all* evidence of the conversations should be suppressed. *See Allen*, ¶¶ 139-142 (Nelson, J., specially concurring) (arguing that both the recording and any testimony about the contents of the recording should be excluded); *Allen*, ¶ 155 (Rice, J., concurring in part and dissenting in part) ("If the electronic monitoring and recording of Golie's conversation with Allen, notwithstanding Golie's consent, really constitutes a prohibited search under Article II, Sections 10 and 11 of the Montana Constitution, then the Concurrence is logically correct that the conversations themselves, in addition to the recordings, must also be suppressed as fruits of a warrantless, unconstitutional search."). What this means, then, for present purposes, is that the relevant expectation of privacy is not strictly in the content of the conversations, since nothing in *Allen* precluded A.S. from testifying in court as to what Stewart had said. Rather, the expectation of privacy under *Allen* is that the government is not monitoring the conversations and making recordings of them. *Allen*, ¶ 49 ("We conclude that Allen had a subjective expectation of privacy that the conversation was not being surreptitiously recorded by a police informant.").

¶39    Seen in this light, the District Court and the State misconstrued the appropriate inquiry under *Allen*. Even assuming, for the sake of argument, that Angelina was able to "glean" the substance of Stewart's conversations with A.S.—indeed, although he did not reveal the full extent of the abuse, he did ultimately tell Angelina between the second and

fourth calls that he "went down on [A.S.] the other day"—this did not automatically vitiate Stewart's expectation of privacy that the telephone conversations were "not being surreptitiously recorded" *by the government*. *Allen*, ¶ 49. In fact, the expectation that government agents would not overhear the conversation was arguably greater for Stewart, who spoke within the confines of his vehicle, than it was for Allen, who spoke in a public venue. *Cf. Goetz*, ¶¶ 29-30 (a person in a vehicle has an expectation of privacy in a conversation "which cannot be overheard by the public outside the vehicle").

¶40 The existence of a subjective expectation of privacy depends on the unique circumstances of each case. Here, the following circumstances are dispositive. Stewart was in his own vehicle when he had the conversations on his cell phone. He hung up when he stopped at a gas station, where maintaining privacy might be more precarious. The vehicle was otherwise moving, except during the first few minutes of the second call. There was only one other person in the vehicle with him. That person was someone he knew and trusted: his wife. Stewart knew that A.S. called him using the landline at the family's residence, rather than her cell phone. There was no indication that somebody was in the house with A.S. listening in on the conversation. There is no evidence that any third party could hear the conversation, except Stewart's wife (and Detective Lester, of whom Stewart was unaware). Stewart had no reason to subjectively expect that he might be exposing his conversation to electronic monitoring by government agents. In these circumstances, Stewart had a subjective expectation not that his statements to A.S. could never be repeated—as noted, nothing in *Allen* precluded A.S. from doing so—but that "the conversation was not being surreptitiously recorded" by the police. *Allen*, ¶ 49.

23

¶41    In responding to Stewart's motion for a new trial, the prosecutor contested only the first factor of the three-prong test—i.e., whether Stewart had a subjective expectation of privacy. The prosecutor did not address the second factor—whether society is willing to recognize that expectation of privacy as objectively reasonable. Nor did the prosecutor address the third factor—whether the state action was justified by a compelling state interest or was undertaken with procedural safeguards such as a properly issued search warrant or other special circumstances. *See Allen*, ¶ 47. As a result, the State does not attempt to argue these points for the first time on appeal. For the sake of thoroughness, however, we shall briefly address these two factors.

¶42    As to objective reasonableness, the *Allen* Court held that society (i.e., the citizens of Montana) is willing to recognize as reasonable the expectation that private cell-phone conversations are not being surreptitiously monitored and recorded by agents working for the State. *Allen*, ¶ 57. Thus, Golie's recording of the conversation at the behest of law enforcement constituted a search. *Allen*, ¶ 61. Under this reasoning, the same conclusion applies here: Lester's recording of the conversations constituted searches.

¶43    As to the nature of the governmental intrusion, the *Allen* Court held that where the police conduct a search without a warrant, it is per se unreasonable absent a recognized exception. *Allen*, ¶ 62 (citing *Goetz*, ¶ 40). Furthermore, the State carries the burden of proving that an exception to the warrant requirement applies. *Allen*, ¶ 62. Since the State did not carry that burden, the Court held that the search was unreasonable. *Allen*, ¶ 64. Again, we must reach the same conclusion here: since the State has not identified any applicable exception to the warrant requirement, the search was unreasonable.

¶44 Based on the foregoing analysis, we hold that the pretext recordings of Stewart's conversations with A.S. violated his rights under Article II, Sections 10 and 11 of the Montana Constitution as interpreted by the Court in *Allen*. We now turn to the third and final sub-issue: whether the admission of the recordings at trial was harmless error.

## C. Was the admission of the recordings harmless error?

¶45 The first step in conducting harmless-error analysis is to determine whether the error is structural error or trial error. *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, 32 P.3d 735. Structural error is the type of error that affects the framework within which the trial proceeds. It typically is of constitutional dimensions, precedes the trial, and undermines the fairness of the entire trial proceeding. Given its nature, structural error cannot be qualitatively weighed against the admissible evidence introduced at trial. As a result, structural error is not subject to harmless-error review; it is automatically reversible, and no additional analysis or review is required. *Van Kirk*, ¶¶ 38-39. Trial error, by contrast, is the type of error that typically occurs during the presentation of a case to the jury. Trial error can be reviewed qualitatively for prejudice relative to other evidence introduced at trial. Thus, trial error is not presumptively prejudicial, is not automatically reversible, and is subject to harmless-error review. *Van Kirk*, ¶ 40. Here, the admission of the recordings of the four pretext calls did not contaminate the trial mechanism along the lines that a biased judge, lack of counsel, or a jury-selection error would. *See State v. Derbyshire*, 2009 MT 27, ¶ 46, 349 Mont. 114, 201 P.3d 811. It can be reviewed qualitatively for prejudice relative to other evidence introduced at trial. We conclude, therefore, that the error was trial error.

¶46 The second step in the analysis is to determine under the "cumulative evidence" test whether the trial error was harmless. *Van Kirk*, ¶¶ 41, 43; *Derbyshire*, ¶ 47. If the tainted evidence was admitted to prove an element of the offense, then the State must direct us to admissible evidence that proves the same facts as the tainted evidence and demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction. *Derbyshire*, ¶¶ 47, 54. But if the tainted evidence was not admitted to prove an element of the offense, then the admission of the evidence will be deemed harmless only if the State demonstrates that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction. *Derbyshire*, ¶¶ 47-48, 54.

¶47 As an initial matter, the State points out that the parties disputed at trial what the recordings actually showed. As noted, the prosecutor argued that the recordings showed Stewart's implicit *admission* of guilt, while Stewart argued that they showed his explicit *denial* of guilt. *See* ¶ 19, *supra*. In any event, the State proceeds on the premise—with which we agree—that the prosecution introduced the recordings for the purpose of proving the elements of the offense, i.e., that Stewart knowingly had sexual intercourse or sexual contact with a descendant. *See* § 45-5-507(1), MCA (defining incest); *see also* § 45-2-101(67), MCA (defining "sexual contact" as "touching of the sexual or other intimate parts of the person of another, directly or through clothing, in order to knowingly or purposely . . . arouse or gratify the sexual response or desire of either party"). Hence, the State must direct us to admissible evidence that proved the same facts as the recordings and show that, qualitatively, there is no reasonable possibility the recordings

26

might have contributed to Stewart's conviction. *Derbyshire*, ¶¶ 47, 54; *Reichmand*, ¶ 23. We conclude that the State has ably met this burden.

¶48    First, the jury was presented with admissible evidence that proved the same facts. A.S. testified that Stewart first touched her vagina when she was 7 years old and that he engaged in sexual contact with her on a regular basis for the next 11 years. A.S. testified that this included fondling her vagina "[a]s many times as I can count," performing oral sex on her, forcing her to perform oral sex on him, and inserting the head of his penis into her vagina when she was 9 years old. A.S. further testified that Stewart treated her more like a lover than a daughter. J.S. stated the same thing in his testimony. J.S. also testified that he had seen a photo of A.S. performing oral sex on Stewart when she was 13 or 14 years old and that Stewart would massage A.S.'s breasts and crotch during family movie nights. J.S. further testified that Stewart had told him fantasies about "how he would like to bang [A.S.]." Angelina testified that Stewart had admitted to her that he "went down on" A.S., which Angelina took to mean "[w]ent down on her private." While Stewart proffered the explanation that he had used this expression to refer to an incident in which A.S. suffered a bad reaction to coffee, he admitted making the statement nonetheless, and it was up to the jury to weigh the credibility of his explanation. Stewart also admitted that he told A.S. "I'd rather rape you than beat you." Although he explained at trial that, in context, what he meant was that he would never beat A.S.—that "I would kill myself before I would beat on you"—it again was up to the jury to weigh the credibility of this explanation. Like the recordings, all of the foregoing evidence served to establish the fact that Stewart engaged in incestuous conduct with A.S. *Cf. Reichmand*, ¶ 22 (holding

27

that the confidential informant's testimony was admissible and proved, generally, the same facts as the inadmissible recordings did).

¶49 As to "the qualitative impact the [recordings] might have had on the fact-finder," *Derbyshire*, ¶ 54, we conclude that this case is distinguishable from *Reichmand*, upon which Stewart relies. Notably, the State's argument regarding this prong of the analysis was "brief and unpersuasive" there, *Reichmand*, ¶ 24, which is not the case here. But more to the point, the qualitative impact of the recordings was much greater there than it was here. For starters, the only admissible evidence the Court identified as proving the same facts as the inadmissible recordings proved was the testimony of Chor, the confidential informant. *Reichmand*, ¶ 22. Reichmand's defense, however, had turned a spotlight on Chor's potential ulterior motives, his shaky mental capacity, and his inability to remember parts of the drug transactions or names of agents he had worked with. The recordings served to confirm Chor's testimony and provided jurors with just what they needed in order to fully believe him: actual, objectively reliable recordings of everything that happened during the transactions. For these reasons alone, the Court concluded that "there is no doubt the recordings 'possibly' influenced the outcome." *Reichmand*, ¶ 24. Furthermore, the Court noted that the circumstantial evidence was far from conclusive, and the recordings filled in large holes and chronological gaps in the testimony of the agents. Reichmand's defense was that he had been misidentified as the person who sold drugs to Chor, and Chor and the agents all acknowledged that there were other people in the residence at the time of the transactions. The Court concluded that the recordings of the transactions, therefore, "constituted objective and qualitatively superior evidence for

28

the jury to compare against Chor's testimony about the details of the transactions and his identification of [Reichmand] as the dealer." *Reichmand*, ¶ 25. Finally, the recordings were the sole piece of evidence that the State presented to the jury during closing arguments. *Reichmand*, ¶ 26.

¶50 In contrast, one important distinguishing feature of the recordings in the present case, as the State points out, is that they are not of the crime itself. In other words, we are not dealing here with a recording of Stewart actually engaging in incest with A.S., which unquestionably would carry a much higher qualitative effect. Furthermore, this is not a case where the recordings filled in large holes and chronological gaps in the witnesses' testimony. Significantly, unlike the situation in *Reichmand*, multiple witnesses testified at Stewart's trial to the same facts that the recordings proved. Indeed, as the State argues, the trial testimony alone provided the jury with qualitatively devastating evidence of incest. Added to this were the photographs that Stewart admittedly took of A.S. naked, including close-ups of her vagina.[1] We are not persuaded by Stewart's argument that the recordings constituted a sort of coup de grâce. Qualitatively, nothing on the recordings is any more inflammatory or prejudicial than the other, admissible evidence at trial. To be sure, the recordings were "objectively reliable," *Reichmand*, ¶ 24, and thus "qualitatively superior," *Reichmand*, ¶ 25, in the sense that mechanical recordings (if they are authentic) are generally not subject to the sorts of weaknesses inherent in human testimony, such as bias, faulty memory, or faulty perception. *Cf. United States v. White*, 401 U.S. 745, 753,

---

[1] We hold below, under Issue 2, that the District Court did not abuse its discretion in admitting these photographs.

29

91 S. Ct. 1122, 1126 (1971) (plurality opinion) ("An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent."). Thus, the recordings theoretically may have "bolstered" the credibility of certain witnesses in the minds of the jurors. *Reichmand*, ¶ 24. Yet, even assuming, for the sake of discussion, that the jurors viewed the recordings as qualitatively more reliable evidence than the human testimony, we must consider whose credibility the recordings served to bolster—and that question is not as clear-cut as Stewart would have us believe. While he attempts on appeal to portray the recordings as clearly *inculpatory* and, thus, supportive of the State's case and the State's witnesses, he took the opposite position at trial and argued to the jury that his statements and responses on the recordings were actually *exculpatory* or, at the very least, ambiguous. Moreover, Stewart used the recordings for purposes of impeachment during his cross-examination of A.S. For all of these reasons, we conclude that any "qualitative impact the tainted evidence might have had on the fact-finder," *Derbyshire*, ¶ 54, was harmless.

¶51 Based on the foregoing analysis, we hold that Stewart is not entitled to a new trial premised on an *Allen* violation.

¶52 ***Issue 2. Did the District Court abuse its discretion in admitting sexually oriented photographs which Stewart took of his daughter?***

¶53 The prosecution indicated before trial that it intended to introduce the photographs of A.S., including those in which she was completely nude or in sexually explicit poses. As noted, Stewart filed a motion in limine to exclude this evidence as irrelevant and unduly prejudicial under Rules 401, 402, and 403 of the Montana Rules of Evidence.

¶54 At the time Stewart filed his motion, the Modified *Just* Rule was still in effect. Under that rule, the prosecution was required to give the defendant written notice if it intended to introduce evidence of other crimes, wrongs, or acts. The notice had to specify the evidence to be admitted, the specific Rule 404(b) purpose or purposes for which the evidence was to be used, and the reason why the evidence was admissible under the purpose(s) stated. *See State v. Matt*, 249 Mont. 136, 142-43, 814 P.2d 52, 56 (1991); *State v. Whitlow*, 285 Mont. 430, 440, 949 P.2d 239, 246 (1997). Such notice had not been provided in the present case. Consequently, in responding to Stewart's motion, the prosecutor invoked *State v. Marshall*, 2007 MT 198, ¶ 16, 338 Mont. 395, 165 P.3d 1129, where the Court stated that "evidence of acts that are inextricably linked to the offense charged are admissible, notwithstanding the criteria of the Modified *Just* Rule." This is known as the "transaction rule." *Marshall*, ¶ 16 (citing § 26-1-103, MCA). The prosecutor argued that the photographs were admissible under this rule.

¶55 The District Court issued an order August 30, 2010, denying Stewart's motion in limine. The court read Stewart's brief to include "an implicit argument that the subject evidence is not only irrelevant but also fails to meet the procedural safeguards of the modified *Just* rule regarding evidence of other crimes or acts." The court reasoned, however, that notwithstanding the Modified *Just* Rule, the photographs were admissible under the transaction rule because they were "inseparably intertwined" with the charged offense. The court also noted that the photographs were relevant to Stewart's state of mind and to the State's theory that Stewart had groomed A.S. to trust him and to accept their alleged sexual relationship.

31

¶56 The District Court did not have the benefit of *State v. Eighteenth Jud. Dist. Ct., Gallatin County, The Hon. Mike Salvagni, Presiding Judge*, 2010 MT 263, 358 Mont. 325, 246 P.3d 415,[2] which this Court rendered shortly after the District Court issued its ruling on Stewart's motion. In *Salvagni*, the Court overruled the Modified *Just* Rule and adopted in its place the procedures outlined at ¶ 49 of the *Salvagni* opinion. Suffice it to say that those procedures, coincidentally or presciently, were largely followed here: the prosecution disclosed the evidence at issue; the defense challenged the evidence's admissibility by means of a motion in limine; the prosecutor responded to the defendant's objections; and the trial court issued a written decision. *See Salvagni*, ¶ 49.

¶57 It is unnecessary, therefore, to resolve the evidentiary issue here by applying the transaction rule. *See Salvagni*, ¶ 54. For that matter, subsequent to *Marshall*, the Court cautioned that "the transaction rule should not be permitted to admit propensity evidence that would otherwise be excluded by Rule 404(b)." *State v. Guill*, 2010 MT 69, ¶ 26, 355 Mont. 490, 228 P.3d 1152 (citing *State v. Berosik*, 2009 MT 260, ¶ 46, 352 Mont. 16, 214 P.3d 776); *accord State v. Sage*, 2010 MT 156, ¶ 36, 357 Mont. 99, 235 P.3d 1284. The Court clarified in *Salvagni* that the proper approach in resolving evidentiary challenges is simply to apply the evidentiary rule or rules under which the challenging party argues the evidence should be excluded. *Salvagni*, ¶ 72. Here, Stewart challenged the photographs as irrelevant and as overly prejudicial propensity evidence.

---

[2] This decision is sometimes referred to as the "Anderson" case due to the name of the defendant in the underlying criminal proceeding (Shanara Anderson). However, because the named respondent in the writ proceeding before this Court was the district court judge, we shall henceforth use "*Salvagni*" to refer to this decision.

## A. Rules 401 and 402

¶58    Rule 402 states that "[a]ll relevant evidence is admissible, except as otherwise provided by constitution, statute, these rules, or other rules applicable in the courts of this state." Thus, if the photographs are relevant, they are admissible by virtue of Rule 402, unless some other rule precludes their admission.

> Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevant evidence may include evidence bearing upon the credibility of a witness or hearsay declarant.

M. R. Evid. 401. Rule 401's basic standard of relevance is a "liberal" one. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587, 113 S. Ct. 2786, 2794 (1993).

¶59    The State alleged that the incest occurred from 1998 to 2009, i.e., from when A.S. was 7 years old to when she was 18. The photographs of A.S. were taken from when she was about 15 until her 18th birthday. They show her in varying states of undress and in sexually provocative poses that Stewart orchestrated, including close-ups of her vagina. The fact that Stewart orchestrated and took sexually oriented photographs of his daughter has a "tendency" to make it "more probable" that he knowingly had sexual contact with her. M. R. Evid. 401; § 45-5-507(1), MCA. The photographs are evidence of that fact and are thus relevant. Notably, A.S. testified that Stewart performed oral sex on her after taking the photographs in the Salt Lake City hotel room. The photographs of A.S. also "bear[ ] upon the credibility of a witness," M. R. Evid. 401—A.S. in particular, as well as J.S. and Angelina—in that they serve to confirm these witnesses' testimony. The photographs are relevant for this reason as well.

¶60 Stewart argues that there is a "temporal" limitation on what constitutes relevant evidence in this case, due to the fact that the State sought an enhanced sentence. *See* § 45-5-507(4), (5), MCA (specifying enhanced sentences if "the victim is under 16 years of age and the offender is 3 or more years older than the victim," or if "the victim was 12 years of age or younger and the offender was 18 years of age or older"). Stewart contends that the Salt Lake City photographs, in particular, are not relevant because A.S. was 18 at the time, "well beyond any age which would trigger an aggravating factor for sentencing purposes." This theory, however, conflates the elements of the *offense* with the facts pertaining to the applicable *sentence*. Even assuming, for the sake of argument, that photographs taken of A.S. when she was 18 are not relevant to prove that Stewart engaged in incest with her when she was under 16, the age of the victim is a fact (albeit, one which the State notes in its brief must be proved beyond a reasonable doubt, *see* § 46-1-401, MCA) that goes to sentencing. Stewart does not challenge his sentence; he challenges his underlying conviction. To convict a person of incest, the State must prove beyond a reasonable doubt that "the person knowingly marries, cohabits with, has sexual intercourse with, or has sexual contact . . . with an ancestor, a descendant, a brother or sister of the whole or half blood, or any stepson or stepdaughter." Section 45-5-507(1), MCA. There is no "age" element here, and thus the State was not required to prove that the incest occurred while the victim was a particular age in order to obtain a conviction. Correspondingly, so long as the Salt Lake City photographs were relevant to prove that Stewart knowingly had sexual intercourse or sexual contact with a descendant during the period alleged (1998 to 2009)—and, for the reasons already discussed, they were relevant

34

for this purpose—the State was entitled to introduce them (unless they were excluded by some other rule of evidence). It was certainly possible that the jury would find Stewart guilty of engaging in incest, but then find that the State had not proved that the incest occurred when A.S. was under 16, thus not triggering the enhanced-sentence provision. That is why the District Court set these out as separate questions on the verdict. *See* ¶ 20, *supra*. As it turned out, the jury found, first, "that the Defendant knowingly had sexual intercourse with or sexual contact with [A.S.], a descendant," and, second, "that an act of sexual intercourse or sexual contact occurred when [A.S.] was under 16 years of age and the Defendant was 3 or more years older than [A.S.]." We agree with the State that the second finding as to A.S.'s age does not *retroactively* render inadmissible any evidence that was otherwise relevant to prove that the incest occurred—such as the photographs.

### B. Rule 404(b)

¶61 Rule 404(b) places a limitation on the admission of relevant evidence. Contrary to Stewart's assertion, this rule does not "forbid[ ] the admission of propensity evidence." Rule 404(b) states that evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith" but may be admissible for various other purposes, "such as" proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The rule does not bar *evidence*. It prohibits, rather, *a theory of admissibility*: using evidence of other crimes, wrongs, or acts to prove the defendant's subjective character, disposition, or propensity (e.g., that he is inclined to wrongdoing in general, or that he tends to commit a particular type of wrongdoing) in order to show conduct in conformity with that character

on a particular occasion. Essentially, the rule disallows the inference from bad act to bad person to guilty person. *Salvagni*, ¶ 47. If the proffered other-acts evidence "proves a material issue without requiring any inference to the defendant's criminal disposition," then Rule 404(b) does not bar its use. Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence* vol. 22A, § 5239, 260 (Thomson Reuters Supp. 2012). On the other hand, "if the necessary logical steps [in the prosecutor's theory of admissibility] include an inference of general character or propensity, or if it seems likely that the proof will be *used* to support such an inference," then the principle of exclusion applies. Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* vol. 1, § 4:28, 746-47 (3d ed., Thomson/West 2007) (emphasis in original).

¶62 The threshold question is whether the rule is implicated. The policy underlying Rule 404(b)'s general prohibition comes into play whenever the nature of the evidence might tempt the jury to decide the case against the defendant on an improper propensity basis. Edward J. Imwinkelried, *Uncharged Misconduct Evidence* vol. 1, § 2:15, 2-87 (rev. ed., Thomson Reuters/West 2009). Rule 404(b) applies to any conduct, criminal or noncriminal, that effectively impugns or reflects negatively on the defendant's character. Imwinkelried, *Uncharged Misconduct Evidence* § 2:15, 2-86; David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 4.6, 273 (Aspen 2009); *see also Huddleston v. United States*, 485 U.S. 681, 685, 108 S. Ct. 1496, 1499 (1988) (Rule 404(b) "generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character"); Wright & Graham, *Federal Practice & Procedure: Evidence* § 5239, 282 (Thomson Reuters 2012) ("other acts" includes "any

conduct, good or bad, that tend[s] to show the character of the person involved"). Here, the fact that Stewart took or orchestrated the photographs at issue unquestionably has a tendency to impugn or reflect negatively on his character. Rule 404(b) is thus implicated.

¶63 Rule 404(b) prohibits the use of the photographs to infer that Stewart has a bad or immoral character and committed incest with A.S. in conformity with that character.

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.

*State v. Sage*, 2010 MT 156, ¶ 37, 357 Mont. 99, 235 P.3d 1284 (citations and internal quotation marks omitted). Yet, while the photographs could not be used to show that Stewart acted in conformity with a bad or immoral character, they could be used for other purposes not involving a character-based propensity inference.

¶64 That brings us to the question of what inference the prosecutor sought to establish through the photographs. The typical prosecution case is reducible to three elements: (1) someone committed the *actus reus* (i.e., forbidden act) alleged in the indictment or information; (2) that person possessed the requisite *mens rea* (i.e., criminal intent or state of mind); and (3) that person was the defendant. Imwinkelried, *Uncharged Misconduct Evidence* § 4:1, 4-3; *Black's Law Dictionary* 41-42, 1075 (Bryan A. Garner ed., 9th ed.,

Thomson Reuters 2009). "In child sexual molestation cases, defendant commonly contests neither identity nor *mens rea*; defendant effectively concedes that if the charged acts occurred, they were committed with criminal intent. This makes *actus reus* the sole significant issue in the case." Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 9.4.2, 594. The present case fits this mold. During his opening statement, Stewart's counsel told the jury: "Mr. Stewart will testify that it did not occur. It never occurred, not once, not -- no how, not no way. And he'll tell you that [A.S. is] making up her story in an effort to get back at him." Stewart did not admit that he had touched A.S., but lacked the requisite state of mind. Nor did he admit that A.S. had been molested, but by somebody else. The primary issue at trial was the existence of the *actus reus*, i.e., whether the alleged incest even took place.

¶65    The use of other-acts evidence to prove the commission of the actus reus does not necessarily run afoul of Rule 404(b). The rule's prohibition does not apply simply because the prosecutor is using such evidence "to draw an ultimate inference of conduct. Rather, the prohibition applies only when that ultimate inference is coupled with the intermediate inference of the defendant's personal, subjective character. If the prosecutor can arrive at an ultimate inference of conduct through a different intermediate inference, the prohibition is inapplicable." Imwinkelried, *Uncharged Misconduct Evidence* § 4:1, 4-5 to 4-6. Professor Leonard provides an example. Defendant was employed to take care of children in ten different homes in different locations over the course of 20 years. None of the families who employed Defendant knew each other. Five of the families accused Defendant of sexually molesting a child in Defendant's care. Charged in

connection with one of these cases, Defendant denies that any sexual molestation occurred, claiming that all contacts with the child were appropriate. Evidence concerning the uncharged molestations may be admissible to show that Defendant committed the charged molestation. The inference is not that Defendant committed the uncharged acts, and thus has an immoral or lecherous character, and thus committed the charged act. The inference, rather, is that it is objectively improbable that there would be this many independent accusations of sexual molestation absent a common cause, and thus Defendant committed the charged act. *See* Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 9.4.2, 607-08.

¶66 Here, the prosecutor argued to the jury that Stewart had sexual intercourse or sexual contact with A.S., citing the photographs as one piece of evidence supporting this. These include photos of Stewart lifting up A.S.'s dress and looking at her buttocks. Stewart had A.S. dress in different outfits, including a bikini and some lingerie. A.S. was completely nude in some photos, and Stewart took close-ups of her vagina. The sexually provocative and graphic nature of these photographs establishes the existence of a sexual dynamic in Stewart's relationship with A.S. Indeed, contrary to his characterization of the photographs as "family photos"—like those a mother would take of a small child in a bathtub—a typical father-daughter relationship does not involve the father taking sexually explicit photographs of his daughter such as the ones at issue here. The existence of this sexual dynamic, in turn, supports the inference that Stewart engaged in sexual intercourse or sexual contact with A.S. This is a permissible inference that is not based on Stewart's character. If Stewart was concerned that the jury would draw a

prohibited propensity inference, he had the option of requesting an instruction under Rule 105. *See Salvagni*, ¶ 49; M. R. Evid. 105 ("When evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."). We conclude that the photographs were admissible for a valid "other purpose" theory. M. R. Evid. 404(b).

### C. Rule 403

¶67   Even where other-acts evidence is "relevant to an issue other than character or the defendant's propensity to commit the charged offense," and is thus not excluded under Rule 404(b), the evidence is still subject to balancing under Rule 403. Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* vol. 2, § 404.21[1][a], 404-64 (Joseph M. McLaughlin ed., 2d ed., Matthew Bender & Co. 2010). Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M. R. Evid. 403.

¶68   Rule 403 does not require the exclusion of relevant evidence simply because it is prejudicial. In a criminal prosecution, most of the evidence offered by the prosecution is prejudicial to the defendant. That is why the evidence is offered: to prove that the defendant committed the charged crime. *State v. Belanus*, 2010 MT 204, ¶ 14, 357 Mont. 463, 240 P.3d 1021; *accord People v. Karis*, 758 P.2d 1189, 1203 (Cal. 1988) (all evidence which tends to prove guilt is prejudicial or damaging to the defendant's case).

40

Rule 403 confers discretion on the trial judge to exclude relevant evidence that poses a danger of "unfair" prejudice, but only if the danger of unfair prejudice "substantially outweigh[s]" the evidence's probative value. This occurs when the evidence will prompt the jury to decide the case on an improper basis. *Belanus*, ¶ 14.

¶69 Stewart faults the District Court for not providing a detailed Rule 403 balancing in its order. The District Court explained, however, that unless the evidence challenged through a motion in limine is "clearly inadmissible," a ruling as to whether the evidence should be excluded is "best left for trial so that issues of foundation, relevance and potential prejudice can be resolved in the proper context." Stewart, therefore, could have renewed his Rule 403 objection at the appropriate time during trial and thereby given the District Court the opportunity to make its ruling "in the proper context."

¶70 Moreover, we are not persuaded that the photographs should have been excluded for the reasons stated in Stewart's motion. First, he argued that the Salt Lake City photos might "mislead" the jury into believing that there indeed was sexual contact with A.S. at that time. Yet, A.S. testified that Stewart in fact performed oral sex on her after taking those photographs; hence, there was no risk that the photos would mislead the jury in that respect. Second, Stewart's contention that the "prejudicial effect [of the photographs] outweighs any probative value that they might have" is without merit. All of the photographs were highly probative of Stewart's sexual relationship with A.S., and the prosecution's use of the photographs at trial was not *unfairly* prejudicial.

¶71 Based on the foregoing analysis, we hold that the District Court did not abuse its discretion in admitting the photographs.

**CONCLUSION**

¶72 Admission of the recordings of the pretext calls contrary to *Allen* was harmless. The sexually graphic photographs were admissible under Rules 401 and 402, and were not excluded by Rules 404(b) or 403.

¶73 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT

Justice Beth Baker, concurring.

¶74 I agree that any error in the admission of the recordings of the pretext calls was harmless. I also agree that the District Court properly admitted the challenged photographs. I therefore join paragraphs 45 through 51 of the Court's discussion of Issue One and all of its discussion with respect to Issue Two.

/S/ BETH BAKER

Justice Jim Rice joins in the concurring Opinion of Justice Baker.

/S/ JIM RICE