DA 09-0252

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 156

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

DONALD RAY SAGE,

       Defendant and Appellant.

APPEAL FROM:     District Court of the Third Judicial District,
In and For the County of Deer Lodge, Cause No. DC 08-01
Honorable Ray J. Dayton, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

       Nancy G. Schwartz, NG Schwartz Law, PLLC, Billings, Montana

       For Appellee:

       Hon. Steve Bullock, Montana Attorney General, Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

       Joan S. Borneman, Deer Lodge County Attorney, Anaconda, Montana

Submitted on Briefs: June 9, 2010

Decided: July 20, 2010

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      Donald Ray Sage (Sage) appeals his conviction for the felony offense of sexual intercourse without consent (SIWC) in the Third Judicial District Court. We reverse Sage's conviction and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      In the fall of 2007, Mary Graham (Mary) routinely spent time at Sage's house in Anaconda, Montana. Mary lived with her boyfriend Jeremiah Bell (Bell) in Anaconda in a camper trailer with no heat or running water. Sage and his then-girlfriend Marian Sage (Marian)[1] allowed Mary to stay at the house on occasion in order to shower and use Sage's computer. Mary had originally been introduced to Sage by her godmother Martha Koffler (Koffler). Sage and Bell worked together delivering newspapers. Sage and Marian allowed other individuals to regularly use their house as a place to hang out and use Sage's computers. Sage and Marian provided food to the individuals who hung out at the house, and allowed them to drink beer and smoke marijuana there as well.

¶3      Mary was a regular at Sage's house for over a month. In the course of spending time there, Mary testified that she came to regard Sage as a pretty good friend, and developed trust in both Sage and Marian. According to Mary's testimony, at some point Sage began paying Mary compliments and "saying things" to her. Sage told Mary he was a photographer who took "exotic" photographs. Sage showed Mary a number of these photographs. The photographs depicted women in various lurid poses, and women in some of the pictures were naked, or skimpily dressed. Some of the photographs also

---

[1] Marian and Sage were married prior to trial.

2

showed Sage himself, posing naked, and Sage's penis showing a "69" tattoo in his pelvic area. Two of the photographs which Sage showed to Mary depicted his penis ejaculating.

¶4     Mary stated that Sage asked her what she thought about the photographs and made comments indicating that he wanted to take pictures of her. Sage suggested that he could take pictures of Mary for her boyfriend Bell as Christmas presents. Mary testified that she was disgusted by the photographs and considered them pornographic. Mary thought it strange that Sage had showed her these photographs, but decided to leave the topic alone. Mary testified that she would not stop going to Sage's house solely on account of the pictures, and also testified that she had nowhere else to go. Sage did end up taking some photographs of Mary although it appears that Mary was fully clothed in all of them. Mary also took some pictures of herself using Sage's camera.

¶5     Mary testified that Sage had asked her on many occasions if she wanted him to shave her pubic area, but she always told Sage "no." After she refused these advances, Mary thought that the whole issue was a "done deal," especially given the fact that she hung out at Sage's house with her boyfriend Bell and others. Despite Sage's advances and her refusals, Mary stated she was still comfortable at Sage's house and felt as though she could trust him.

¶6     On December 11, 2007, Mary had been at Sage's house using the computer checking her "My Space" page and talking to her friends. Marian went on an errand, leaving Sage and Mary alone in the house for the first time. Mary testified that Sage came into the computer room dressed only in his boxer shorts. Mary testified that Sage's boxers were pulled down and that his penis was exposed to her. Mary "freaked out" and

3

tried to leave, but Sage grabbed her arm, causing Mary a significant amount of pain due to nerve damage and scars she suffered after contracting meningitis. Mary testified that she ended up on the floor, and that Sage held her arms and told her to relax, enjoy it, and that he just wanted to give her pleasure. Mary resisted by kicking, crying, screaming and trying to get away, and testified that she repeatedly told him "no." Sage then allegedly ripped off her pants and underwear, got between her legs, and continued to hold her arms above her head. Eventually, Mary gave up, laid on the floor, and attempted to "tune out" what Sage was doing to her. At trial, Mary testified that she was accustomed to "tuning out" when confronted with traumatic experiences in her life.

¶7 Mary testified that Sage then pulled out an electric razor and used it as a vibrator on Mary, telling her again that he only wanted to give her pleasure. Sage allegedly then asked Mary again if she wanted him to shave her, and ultimately penetrated her with his penis. Sage allegedly threatened Mary, stating that if she told anybody or mentioned it, he would either say that she begged him for it and "wanted it," or he would deny the incident outright.

¶8 Mary testified that she did not initially want to report the alleged rape, and wanted to put it out of her mind and go on with her life. She threw away the clothes she had been wearing, including the ripped pants. However, a week after the rape she told Koffler about the incident and Koffler made her report it to the police.

¶9 On December 18, 2007, Koffler took Mary to the Anaconda police station to report that she had been raped by Sage. Mary was interviewed by Detective Steven Barclay of the Anaconda-Deer Lodge Police Department in Anaconda. Mary told Det.

4

Barclay the version of events noted above. Based upon information provided by Mary, the officers obtained a search warrant for Sage's house. Mary informed the officers that there was a "pot pipe" in Sage's house, and described its location. During the search, officers seized two razors, Sage's computers, a digital camera, photographs, and the pot pipe in the location where Mary said it would be.

¶10 Sage was arrested for misdemeanor possession of drug paraphernalia. Sage was interviewed by law enforcement and gave a voluntary statement to the police while in custody. Sage told the officers that he did not rape Mary. At trial, Sage claimed that when he and Mary were alone in the house, Mary approached him after taking a shower with towels wrapped around her head and middle, and asked him to shave her pubic area. Sage stated that he thought the request was weird, but nonetheless agreed to do it. Sage denied holding Mary down or penetrating her in any manner.

¶11 Sage was subsequently charged with misdemeanor possession of drug paraphernalia and SIWC. Prior to trial, Sage filed a motion in limine seeking to exclude any reference to other crimes, wrongs, or acts which he may have committed. The motion sought to exclude the photographs he had shown to Mary of the various women, Sage himself, and his penis. Sage did not seek to exclude the photographs of Mary, because the digital stamp on the photos of Mary indicated they had been taken after the date of the alleged rape, thus demonstrating that Mary had returned to Sage's house after she claimed she was raped.

¶12 Generally speaking, M. R. Evid. 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts in order to show that the defendant acted in conformity

5

therewith, but does allow the admission of such evidence for other purposes, such as to prove motive or intent. *State v. Marshall*, 2007 MT 198, ¶ 15, 338 Mont. 395, 165 P.3d 1129. If the State intends to introduce evidence of other crimes, wrongs, or acts, it must provide written notice pursuant to the Modified *Just* Rule described by this Court in *State v. Matt*, 249 Mont. 136, 814 P.2d 52 (1991). The "transaction rule," codified at § 26-1-103, MCA,[2] permits the introduction of evidence of prior bad acts which are inextricably linked to the charged offense, notwithstanding the criteria and requirements of the Modified *Just* Rule. *Marshall*, ¶ 16. The State in this case did not comply with the Modified *Just* Rule, but argued that the photographs were inextricably linked to the sexual intercourse without consent charge, and were thus admissible under the "transaction rule."

¶13 The District Court agreed with the State and allowed the admission of the disputed photographs under the transaction rule. In its ruling from the bench at the final pretrial conference, the District Court expressed some discomfort with the idea that the photographs were admissible as evidence of Sage "grooming" Mary in preparation to commit the offense.[3] The District Court observed that grooming evidence did not fit well with the forcible rape situation as alleged by the State, and also that Mary was of adult age, while "grooming" usually involves an underage victim. However, noting that the

---

[2] The transaction rule reads as follows: "Where the declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." Section 26-1-103, MCA.

[3] " 'Grooming' is 'the process of cultivating trust with a victim and gradually introducing sexual behaviors until reaching the point' where it is possible to perpetrate a sex crime against the victim." *Marshall*, ¶ 19 (quoting *United States v. Johnson*, 132 F.3d 1279, 1283 n. 2 (9th Cir. 1997)).

transaction rule would allow the admission of evidence if it forms part of the disputed transaction, the District Court determined that if the photographs were actually a part of the conduct, communications, and relationship activity between Sage and Mary, then they would qualify as a part of the transaction.

¶14 Sage's trial was held on October 6-8, 2008. On the morning of the first day of trial, Sage entered a guilty plea to the misdemeanor charge of possession of drug paraphernalia. The District Court received his guilty plea in chambers, outside the presence of the jury. In light of his change of plea, Sage argued that all the evidence related to this charge was no longer relevant and therefore inadmissible under M. R. Evid. 404(b). The State argued that it should be able to present evidence that Mary was a part of a group that hung out at Sage's house and regularly drank and smoked marijuana. The State contended that this group was "almost like a subculture," and that it was important for the jury to understand how Mary fit into this group and came to trust Sage prior to the alleged rape. The District Court, however, ruled that such evidence would not be admitted under the transaction rule in light of the fact that the possession charge was no longer at issue and the drug-related other acts did not relate to the rape allegations.

¶15 The State filed a motion for the District Court to reconsider this ruling. The State argued that evidence of drug use and drug paraphernalia was contemporaneous to the sexual intercourse without consent charge, and that the prohibition of such evidence would deprive the State of its right to a fair trial. The State contended that the legs would be "cut out from under the victim's case" without this evidence. In response to the

State's motion, the District Court reversed itself and ultimately allowed the drug-related evidence to come in. Noting the State's assertion that Mary witnessed Sage and the others at the house drinking beer and smoking marijuana the morning of the rape, and that she told officers where a marijuana pipe would be found in Sage's house, the court concluded this evidence would corroborate Mary's testimony. Accordingly, the District Court concluded that this evidence would be admissible under the transaction rule. As stated by the District Court, under "the State's theory of the case insofar as the County Attorney has described the situation is probably explanative of a question that[] may be in a juror's mind; 'what in the heck is this 50-some year old guy doing with these 19 year old kids and what not' and the Jury is entitled to context. That's part of the transaction rule." However, after a brief recess, the State corrected itself, and told the court that Mary *had not* seen Sage and others smoking marijuana and drinking beer on the morning of the alleged rape because she was not at Sage's house. The District Court told the State that this new revelation made the court "really unhappy," but it nonetheless declined to reverse its decision to allow the evidence to be admitted.

¶16 During trial, the jury heard from the officers involved in the investigation, Mary, Marian, Sage, and other individuals. The issue of drug use at Sage's house was referred to many times. Furthermore, the State attempted unsuccessfully to have the pot pipe seized at the house admitted into evidence. The disputed photographs were admitted into evidence as well. The District Court gave limiting instructions at Sage's request regarding the evidence of drug use and the disputed photographs. The District Court also gave the jury a lesser included offense instruction for sexual assault.

8

¶17 The jury ultimately convicted Sage of SIWC. Sage was sentenced to 30 years in prison on the SIWC charge, and 6 months for criminal possession of drug paraphernalia. Sage was designated a Tier III sex offender. He was required to serve at least 10 years in prison, and would not be eligible for parole until he completed Phase I and II of the sex offender program at the Montana State Prison.

¶18 Sage now timely appeals his conviction for sexual intercourse without consent. We state the issues on appeal as follows:

¶19 **Issue One:** *Did the District Court abuse its discretion when it admitted evidence of drug use at Sage's house?*

¶20 **Issue Two:** *Did the District Court abuse its discretion when it admitted the disputed photographs into evidence?*

## STANDARD OF REVIEW

¶21 A trial court has broad discretion when it determines the relevance and admissibility of evidence. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. Generally speaking, we review a district court's ruling on evidentiary matters for an abuse of discretion. *Derbyshire*, ¶ 19. An abuse of discretion can be found if the district court acts arbitrarily without the employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *Derbyshire*, ¶ 19 (citing *State v. McOmber*, 2007 MT 340, ¶ 10, 340 Mont. 262, 173 P.3d 690). However, a district court is bound by the Montana Rules of Evidence as well as applicable statutes. "Thus, to the extent the court's ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo." *Derbyshire*, ¶ 19 (citing *State v. Mizenko*, 2006 MT

11, ¶ 8, 330 Mont. 299, 127 P.3d 458). Under these conditions, we review the district court's conclusions de novo to determine whether the court correctly interpreted the law. *Derbyshire*, ¶ 19 (citing *State v. Incashola*, 1998 MT 184, ¶ 9, 289 Mont. 399, 961 P.2d 745; *State v. Weaver*, 2008 MT 86, ¶ 10, 342 Mont. 196, 179 P.3d 534).

¶22 **Issue One:** *Did the District Court abuse its discretion when it admitted evidence of drug use at Sage's house?*

¶23 On appeal, the State concedes that the District Court erroneously admitted evidence of marijuana use and possession of drug paraphernalia under the transaction rule. The State admits that the marijuana evidence was only "tangentially related to Sage's commission of sexual intercourse without consent." The State argues, however, this error was harmless relying on *State v. Insua*, 2004 MT 14, 319 Mont. 254, 84 P.3d 11.

¶24 In *Insua*, defendant Insua was charged with criminal production or manufacture of dangerous drugs, sexual intercourse without consent upon a minor female, and three other instances of sexual assault. The drug and sex crimes charges were ultimately severed. *Insua*, ¶ 6. At trial on the sex crimes, one of the victims testified that she had seen Insua smoking marijuana and the presence of pipes in an outbuilding referred to as "the pantry" where Insua spent a lot of "alone time" and where one of the sexual assaults allegedly occurred. *Insua*, ¶ 9. Testimony at trial indicated that Insua kept candy, dolls, children's toys and a television in the pantry.

¶25 After his conviction, Insua argued his conviction should be reversed and that evidence of his marijuana use was "bad character" evidence which should prohibited

under M.R. Evid. 404(b), since the State failed to comply with the requirements of the Modified *Just* Rule. *Insua*, ¶ 39. The State argued that the evidence was admissible under the transaction rule, and that it was explanatory of the circumstances surrounding the alleged sexual offenses. *Insua*, ¶ 41. We held that the district court abused its discretion in admitting the evidence in light of its earlier ruling severing the charges. *Insua*, ¶ 43. However, the Court ultimately concluded that the admission of the evidence constituted trial error which was not prejudicial to Insua. *Insua*, ¶ 44. Because the tainted evidence did not go to prove an element of sexual intercourse without consent or sexual assault, the State was required to prove that there was "no reasonable possibility" that the tainted evidence contributed to Insua's conviction. *Insua*, ¶ 45. We held the State met its burden in that case for several reasons. First, the drug use was mentioned by only one of the State's witnesses in 2 pages of a trial transcript totaling over 530 pages long. *Insua*, ¶ 46. Second, we noted the prosecutor made only a very brief reference to marijuana use during closing argument, and then only in conjunction with other evidence that demonstrated Insua kept dolls, candy, TV, tequila, and other items in the pantry. Furthermore, the prosecutor did not imply that the conviction for a sex crime was warranted because of marijuana evidence. *Insua*, ¶ 47.

¶26    Sage argues that *Insua* is distinguishable and that the State has failed to prove the error in this case was harmless. Sage notes that the prosecutor here referred to marijuana use in her opening statement. Further, the lead investigating officer testified at trial that the application for the search warrant in this case was based in part on information related to marijuana use at the house. The State also tried to have the pot pipe seized at the

11

house admitted into evidence, thus drawing the jury's attention to the fact of illegal drug use. Furthermore, the State elicited testimony about marijuana use from Sage himself during cross-examination. Sage contends that since there was no question that Mary and Sage had not smoked marijuana either before or after the alleged rape, the repeated references to marijuana use by the State were gratuitous and prejudicial.

¶27 The parties agree that the complained error in this case is trial error, as opposed to structural error. Accordingly, harmless error analysis requires this Court to determine whether the tainted evidence was admitted to prove an element of the offense. *Derbyshire*, ¶ 47. "[I]f the tainted evidence was not admitted to prove an element of the offense, then the admission of the evidence will be deemed harmless only if the State demonstrates that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction." *Derbyshire*, ¶ 47. Here again, the parties agree that the evidence of marijuana use was not used to prove an element of the offense. Thus, the question is whether the State can demonstrate there is no reasonable possibility that the tainted evidence might have contributed to Sage's conviction.

¶28 As noted by Sage, the State's harmless error argument on appeal is diametrically opposed to the argument it presented before the District Court. In arguing for the admission of the marijuana evidence in its motion for reconsideration, the State complained that the exclusion of such evidence would "cut the legs out" from under the State's case. Now the State argues just the opposite, claiming that there was no reasonable possibility that the tainted evidence might have contributed to Sage's

12

conviction. This argument is disingenuous at best given the State's position before the District Court.

¶29 In any event, we conclude the State has failed to meet its burden and prove there is "no reasonable possibility" that the tainted evidence might have contributed to Sage's conviction. This Court has recognized in previous cases the prejudicial nature of evidence concerning drug use. *See State v. Ingraham*, 1998 MT 156, ¶ 47, 290 Mont. 18, 966 P.2d 103; *State v. Beachman*, 189 Mont. 400, 616 P.2d 337 (1980). In some cases, of course, evidence of drug use is inextricably linked to the allegations in support of the charged offense, and thus the State has the right to bring such evidence to the jury. *See State v. Buck*, 2006 MT 81, ¶ 79, 331 Mont. 517, 134 P.3d 53. However, the State concedes this is not the state of affairs in the case sub judice. Moreover, given the numerous occasions throughout trial where drug use was mentioned, this case is distinguishable from *Insua* where the references to drug use by the defendant were relatively brief and minor.

¶30 Furthermore, when evaluating the impact of tainted evidence it is "the *quality* of the tainted evidence (more specifically, the qualitative impact the tainted evidence might have had on the fact-finder), not the *quantity* of the admissible evidence, [which] is the proper focus when determining whether trial error was harmless. To that end, the State must show that, *qualitatively*, there is no reasonable possibility the tainted evidence might have contributed to the defendant's conviction." *Derbyshire*, ¶ 54 (citing *Van Kirk*, ¶¶ 34-36, 43-44, 46). It is patent in this case that the State wanted evidence of drug use at Sage's house to be firmly in the mind of the jury. We agree with Sage that this evidence

13

likely painted him as either a person who gave "pot parties" at his house, or was possibly a drug dealer. At any rate, we simply cannot conclude that the State has satisfied its burden to show that there was "no reasonable possibility" that evidence of drugs contributed to Sage's conviction. Thus, we conclude that the admission of this evidence was not harmless error.

¶31 **Issue Two:** *Did the District Court abuse its discretion when it admitted the disputed photographs into evidence?*

¶32 Sage argues that the District Court abused its discretion when it admitted the photographs of the other women, himself, and the depictions of his penis under the transaction rule. Sage contends that the disputed photographs were not "inextricably linked" to the charged offense and were highly prejudicial. Sage notes that the State told the jury the photographs would "make a sailor blush." Sage argues that we recently noted in *State v. Guill*, 2010 MT 69, 355 Mont. 490, 228 P.3d 1152, that the transaction rule "should not be permitted to admit propensity evidence that would otherwise be excluded by Rule 404(b)." *Guill*, ¶ 26 (citing *State v. Berosik*, 2009 MT 260, ¶ 46, 352 Mont. 16, 214 P.3d 776).

¶33 The State contends the disputed photographs were properly admitted under the transaction rule. The State notes that in order to convict Sage of SIWC it was required to prove that: (1) Sage had sexual intercourse with Mary; (2) it was without Mary's consent; and (3) Sage acted knowingly. *See* § 45-5-503(1), MCA. Further, Sage requested and received a lesser included offense instruction for sexual assault. In order to prove sexual assault, the State was required to show that: (1) Sage subjected Mary to

14

sexual contact; (2) without Mary's consent; and (3) Sage acted knowingly. *See* § 45-5-502(1), MCA. Sexual contact in this context includes "the touching of the sexual or other intimate parts of the person of another, directly or through clothing, in order to knowingly or purposely . . . cause bodily injury to or humiliate, harass, or degrade another . . . [or] arouse or gratify the sexual response or desire of either party." Section 45-2-101(67), MCA. Accordingly, the State contends that Sage himself broadened the scope of the transaction from a forcible rape, to include assertions that he shaved Mary's pubic area. Thus, the State argues that the photographs demonstrate the nature of Sage's sexual advances and interest in Mary, and show that his contact with Mary was done for purposeful or knowing arousal or sexual gratification.

¶34 Furthermore, although the State notes the District Court's discomfort with admitting the photographs as evidence of "grooming" behavior, the State argues that nothing in this Court's case law should be construed to limit grooming evidence to only those cases involving a minor. The State contends the evidence shows how Sage gradually introduced sexual elements into his relationship with Mary after he gained her trust, by complimenting her, showing her the photographs, asking her to pose for him, and telling her that he liked his women "bald." The State argues that the photographs were properly admitted under the transaction rule.

¶35 Alternatively, the State argues that if the admission of the photographs is found by the Court to be in error, their admission was harmless. In this connection, the State notes that Sage challenges only the admission of the photographs themselves, but not Mary's direct testimony that Sage showed her the pictures. The State contends, therefore, that

15

the jury was presented with admissible evidence which proved the same facts as the allegedly "tainted" evidence. Accordingly, the State argues that there was no reasonable possibility that the photographs themselves might have contributed to Sage's conviction. Finally, the State notes that the District Court gave a cautionary instruction when it admitted the photographs, and contends this instruction was sufficient to cure any prejudice to Sage.

¶36 This case presents the Court with another opportunity to clarify the scope and application of the transaction rule. We note that our recent caselaw in this area has emphasized the fact that the transaction rule should not be used to admit evidence of other crimes, wrongs or acts in violation of M. R. Evid. 404(b) in order to prove the character of a defendant and show that he acted in conformity with that character in relation to the currently charged offense, when the State fails to comply with the requirements of the Modified *Just* Rule. *Berosik*, ¶ 46; *Guill*, ¶ 26. While this Court recognizes "the legitimacy of admitting properly limited evidence that is 'intrinsic to' or 'inextricably intertwined with' a charged crime," *Guill*, ¶ 28 (citing authorities), courts must nonetheless exercise great caution when handling potentially inflammatory propensity or character evidence.

> [W]e explained in *State v. Croteau*, 248 Mont. 403, 407, 812 P.2d 1251, 1253 (1991), and again in *State v. Ray*, 267 Mont. 128, 133-34, 882 P.2d 1013, 1016 (1994), that evidence of other crimes, wrongs, or acts must, as a general rule, be excluded because "prior acts or crimes are highly prejudicial to the defendant, and usually irrelevant for purposes of the charged crime." Evidence of a defendant's prior acts or uncharged misconduct creates the risk that the jury will penalize him simply for his past bad character, *Croteau*, 248 Mont. at 407-08, 812 P.2d at 1253; *Ray*, 267 Mont. at 134, 882 P.2d at 1016, or prejudge him and deny him a fair

16

opportunity to defend against the particular crime charged, *State v. Gowan*, 2000 MT 277, ¶ 19, 302 Mont. 127, 13 P.3d 376.

*Derbyshire*, ¶ 51.

¶37    Similarly, in *Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644 (1997), the

United States Supreme Court also noted the dangers of such "propensity evidence" in the

following terms:

> "Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character, *Greer* v. *United States*, 245 U.S. 559, 62 L. Ed. 469, 38 S. Ct. 209, but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice."

*Old Chief*, 519 U.S. at 181, 117 S. Ct. at 650-51 (quoting *Michelson v. United States*, 335

U.S. 469, 475-76, 69 S. Ct. 213 (1948) (footnotes omitted)).

¶38    On the other hand, we have recognized the importance of admitting evidence

under the transaction rule in order to ensure that the jury hears the applicable evidence

"so that it may evaluate the evidence in the context in which the alleged criminal act

occurred." *Berosik*, ¶ 45 (citing *Derbyshire*, ¶ 29). In *Old Chief*, the United States

Supreme Court recognized the State's important interest in presenting its case in full

17

narrative richness, and satisfying a jury's natural tendency to want to hear the full story of the alleged offense. *Old Chief*, 519 U.S. at 188-89, 117 S. Ct. at 654. In this connection, the Supreme Court noted that the State's ability to fully present its case is important to its overall credibility with the jury, and reassures the jury that the State is not withholding evidence necessary to decide the case. *Old Chief*, 519 U.S. at 188 n. 9, 117 S. Ct. at 654 n. 9.

¶39    With these considerations in mind, we now turn to the disputed evidence. The District Court premised its decision to admit the disputed photographs primarily on the grounds that the jury needed the full context in order to understand and pass judgment on whether Sage committed the offense of SIWC. The District Court held the evidence was admissible under the transaction rule because it "helps explain" the charged conduct. However, we conclude that because the disputed photographs were not "intrinsic to" or "inextricably intertwined" with the SIWC or sexual assault charges, the fact that these photographs might "help explain" the charged conduct is insufficient to bring them under the ambit of the transaction rule.

¶40    The allegations in support of the SIWC charge were that Sage forcibly raped Mary against her will. The disputed photographs underscore Sage's sexual interest in women in general and even Mary herself. The photographs of Sage's penis also speak to a prurient interest in pornography. Thus, from a certain perspective, they could certainly provide context for the circumstances under which the offense occurred, and fairly lead to the conclusion that Sage was attempting to get Mary to engage in some sort of sexual activity with him. However, it is quite another thing to conclude that such evidence is

18

inextricably intertwined with the allegations that Sage forcibly raped Mary, or committed a sexual assault, simply because it provides some context for the charged conduct.

¶41   Here, the photographs are not evidence of any of the facts in dispute and do not explain how Sage knowingly had sexual intercourse with Mary without her consent, or that he knowingly committed a sexual assault. Evidence of these disputed facts came from the testimony of Mary herself, or other testimony elicited at trial. Thus, we hold that the District Court erroneously admitted the disputed photographs under the transaction rule.[4]

¶42   Finally, we cannot conclude that the admission of the photographs was harmless error. These photographs are shocking, disgusting, and highly offensive; therefore the State cannot establish that there was no reasonable possibility their admission might have contributed to Sage's conviction. Indeed, the State characterized the photographs to the jury as sufficient to "make a sailor blush," thus emphasizing to the jury their prejudicial character. Under these circumstances, it is not possible to conclude that the cautionary instruction given by the District Court was sufficient to mitigate the prejudicial impact of the photographs.

## CONCLUSION

---

[4] The State suggests in its brief that the photographs could be admitted for "other purposes" under M. R. Evid. 404(b), such as to corroborate Mary's testimony that Sage showed her the disputed photographs and talked to her about his interests in "exotic" photography. We make two points in this connection. First, the State failed to comply with the requirements of the Modified *Just* Rule. Thus, the State's argument for admission of this evidence for "other purposes" under M. R. Evid. 404(b) is a non-starter. Second, the State correctly notes that Mary's testimony *about* the pictures, and the fact that Sage showed them to her, has not been challenged on appeal. Accordingly, our Opinion expresses no view on these collateral issues and is solely concerned with the admission of the photographs themselves.

¶43 We conclude the District Court abused its discretion when it admitted evidence of marijuana use at Sage's house and the disputed photographs under the transaction rule. We reverse Sage's conviction and remand this matter for a new trial in a manner consistent with this Opinion.

/S/ PATRICIA COTTER

We concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ MICHAEL E WHEAT

Chief Justice Mike McGrath, concurring in part and dissenting in part.

¶44 I concur in the Court's opinion that under the circumstances of this case the admission of drug use at Sage's house was not harmless error and, thus, the conviction should be reversed.

¶45 However, I dissent from the Court's holding regarding the photographs. Because the Court has reversed the conviction based on the marijuana evidence, it was not necessary to address the admission of the photographs. I would not reach this issue.

¶46 Therefore, I concur in part and dissent in part.

/S/ MIKE McGRATH