FILED

07/11/2023

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0405

DA 21-0405

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 132

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

NATHAN BRYCE HARDIN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
                  In and For the County of Missoula, Cause No. DC 19-479
                  Honorable Shane Vannatta, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
            Attorney General, Helena, Montana

            Chad Wright, Appellate Defender, Alexander H. Pyle, Assistant
            Appellate Defender, Helena, Montana

      For Appellee:

            Kirsten Pabst, Missoula County Attorney, Meghann Paddock, Deputy
            County Attorney, Missoula, Montana

Submitted on Briefs: May 10, 2023

Decided: July 11, 2023

Filed:

_____
                  Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Nathan Bryce Hardin (Hardin) appeals from his conviction for threats and other improper influence in official and political matters and the imposition of pretrial supervision costs entered in the Fourth Judicial District Court, Missoula County. We affirm his conviction and remand to strike the pretrial supervision costs.

¶2 Hardin presents the following issues for review:

1. *Did the District Court abuse its discretion when it admitted evidence of Hardin's prior sex offense?*

2. *Did the District Court err by imposing pretrial supervision costs without considering Hardin's ability to pay?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On August 4, 2019, Deputy Tyler Terrill (Deputy Terrill) pulled Hardin over to conduct a DUI investigation. During the investigation, Hardin was talkative and agitated. Deputy Terrill contacted dispatch to run Hardin's license and registration and learned that Hardin was a registered sex offender. Deputy Terrill asked Hardin for a roadside breath sample, but Hardin declined. Hardin placed his hands behind his back and asked for Deputy Terrill to arrest him. Deputy Terrill handcuffed Hardin, placed him in the back of the patrol car, and transported him to the jail for DUI processing, where Hardin again refused to provide a breath sample. When Deputy Terrill told Hardin he would seek a telephonic search warrant for a blood draw, Hardin grew more agitated and told Deputy Terrill that a nonconsensual blood draw was illegal. Deputy Terrill obtained the warrant and collected Hardin from the holding cell to transport him to the hospital for the blood

2

draw. During the transport to the hospital, Hardin said it would take force to hold him down for the blood draw, he knew the law and his blood could not be taken by force, he would "fight this shit," and nobody would stick a needle in his arm. Deputy Terrill radioed dispatch to alert the hospital about the situation.

¶4 Further, the following conversation occurred in the police vehicle during the transport to the hospital:

> HARDIN: I'm not consenting to this at all. Can you show me the court order?
>
> DEPUTY TERRILL: [Indecipherable.]
>
> HARDIN: Show me the court order and you got it. I won't fight ya. But show me the court order.
>
> DEPUTY TERRILL: It's right here.
>
> HARDIN: I haven't seen it.
>
> DEPUTY TERRILL: Okay. At this point, man, I don't really care anymore.
>
> HARDIN: I understand you say that, but I do care.
>
> DEPUTY TERRILL: Okay.
>
> HARDIN: 'Cus I think this is illegal.
>
> DEPUTY TERRILL: Okay.
>
> HARDIN: What judge signed the order?
>
> DEPUTY TERRILL: Judge Jenks.
>
> . . .
>
> HARDIN: Based on what?
>
> DEPUTY TERRILL: Based on everything that I told her. [13-second pause.] I tried, we tried to do it the easy way, man.

3

HARDIN: It ain't my problem.  You can tell her whatever.  But, you don't have proof.  And when it comes to probable cause, they're looking at the video, it doesn't matter what a blood test shows.

DEPUTY TERRILL: Sure.

HARDIN: It really doesn't.

DEPUTY TERRILL: Okay.

HARDIN: Especially when I put my foot to foot.

DEPUTY TERRILL: Okay.

HARDIN: And I stood in that room with you.  Didn't even move my feet and didn't fall over.

DEPUTY TERRILL: Sure.

HARDIN: So, I don't know what you fucking told her, but . . .

DEPUTY TERRILL: Okay.

HARDIN: You're trying way too hard, brother man.  For a so-called Christian.

DEPUTY TERRILL: Okay.

HARDIN: I'll see you at Zootown [church].  I'll follow you home one day.

DEPUTY TERRILL: I'm sorry, what was that?

HARDIN: Um, I don't know, look back on your video.

DEPUTY TERRILL: Yeah, I would be very careful making threats like that. 'Cus you don't know where I live but . . .

HARDIN: I already do.

DEPUTY TERRILL: Okay.

HARDIN: I know your kids.

DEPUTY TERRILL: Okay.

HARDIN: I know what your wife looks like. I've been to church with you, fucker.

DEPUTY TERRILL: Okay.

HARDIN: You're a fucking sinner and liar.

DEPUTY TERRILL: Okay.

HARDIN: I'm just telling you, dude. I mean, you want to roughhouse me because I tell you I know who the fuck you are?

DEPUTY TERRILL: I'm just telling you, man, you don't want to go there.

HARDIN: Listen, we're going to have a successful night. You're gonna get your little blood test. We're going to go back to the jail. If you choose to roughhouse me because of what I've said . . .

DEPUTY TERRILL: I don't want to roughhouse you, man. I really don't.

HARDIN: Then don't. But know that I know where you go to church, I know what your wife looks like, and I know you got a kid, not kids.

DEPUTY TERRILL: Okay.

HARDIN: Actually, I believe a little girl, if I remember correctly. But I've got a little girl too. So I wouldn't, it's not like I'm making any threats. I just know who the fuck you are, dude.

DEPUTY TERRILL: No, you're absolutely making threats, buddy.

HARDIN: Why? By saying I know who you are?

DEPUTY TERRILL: Telling me you're gonna follow me home, you know who my kid is. You're a sex offender, man. I'm telling you, I'm telling you right now you do not want to go here.

HARDIN: Listen, [indecipherable], you don't know my offense.

5

DEPUTY TERRILL: I'm just telling you, man.

HARDIN: You're making accusations.

DEPUTY TERRILL: I'm not making accusations.

HARDIN: [Indecipherable.]

DEPUTY TERRILL: Okay.

HARDIN: Listen, you don't know what happened to me. I'm charged with a misdemeanor. I have custody. I have an eleven-year-old daughter.

DEPUTY TERRILL: Okay.

HARDIN: Don't even assume shit or judge . . .

DEPUTY TERRILL: I'm just saying, man . . .

HARDIN: . . . and call yourself a Christian.

DEPUTY TERRILL: I'm just saying you don't want to be threatening to be following me home.

HARDIN: I can follow you wherever I want.

DEPUTY TERRILL: Okay.

HARDIN: It's free rights.

DEPUTY TERRILL: Sure. That's fine.

HARDIN: I already know where you live.

DEPUTY TERRILL: Okay.

HARDIN: Like I know your church. What's wrong with me, I'll go out driving one night and see you driving and follow you home.

DEPUTY TERRILL: Okay. That's fine.

HARDIN: You can't pull me over for that.

DEPUTY TERRILL: That's fine.

HARDIN: Can you pull me over for that?

DEPUTY TERRILL: There's only one way to find out, bud.

HARDIN: Uh, I did it to other cops, they never pulled me over.

¶5 At the hospital, Hardin became cooperative, and his blood was drawn. The State charged Hardin with one count of threats and other improper influence in official and political matters in violation of § 45-7-102(1)(a)(i), MCA, and one count of misdemeanor driving under the influence in violation of § 61-8-401(1)(a) (2019), MCA. Hardin later pleaded guilty to DUI, but proceeded to a jury trial on the count charging he made threats and tried to improperly influence Deputy Terrill.

¶6 Prior to trial, Hardin filed a motion in limine seeking to exclude evidence of his misdemeanor sex offense. He argued that pursuant to M. R. Evid. 404(b) and 403, his sex offender status was impermissible character evidence and was substantially more prejudicial than probative. The State responded that the evidence was "admissible to give context to the circumstances under which [Hardin's] threats were communicated," was not "offered to prove character or action in conformity therewith," and showed Hardin's "intent, knowledge, or purpose in making the statements he made."

¶7 The District Court ruled on the motion in limine at a pretrial conference, noting first that it was "very mindful of the affect. [sic] that" the misdemeanor sex offender evidence "may have to the jury and . . . wants to ensure" Hardin received a fair trial. The court

7

ultimately concluded that the State could introduce evidence of Hardin's sex offender status because it was being used for permissible purposes under Rule 404(b) and was admissible under the transaction rule. The court explained that:

> [I]n reviewing the audio, [it] heard . . . three warnings by . . . Deputy Terrill, that he was perceiving the discussion or statements that Hardin was making as threats, and, indeed, it was, I believe, during the third warning that Deputy Terrill said . . . "I most definitely feel you are threatening me. You have said you're going to follow me home, and that you know my wife, and . . . that you know I have a daughter." And then he says, "And you're a sex offender."
>
> Now, if the discussion had ended right there, I would be excluding that particular statement, and any reference to Hardin being a sex offender at all, and any discussion about it, whatsoever. But Mr. Hardin then clarifies the nature of the sex offense, which does not make it admissible, necessarily, and then proceeds to make additional threats.
>
> So, when confronted with the fact that Deputy Terrill was feeling threatened—and, yes, it was Deputy Terrill who inserted the sex offender information, at least in the audio recording, and that would be inappropriate, but it was followed on its heels by additional threats from Mr. Hardin.
>
> And, so, therefore, Mr. Hardin was aware that specifically threatening . . . Deputy Terrill's wife and daughter were a concern for him because of the . . . registered sex offender denomination. And rather than retracting, reversing course, . . . [Hardin] doubles or triples down and says . . . . "I can follow you whenever I want. I already know where you live. I'll go out and follow you." So having been presented with, again, this perceived threat from him, Mr. Hardin triples down.
>
> So, given that, I'm happy to entertain a proposed instruction that would try to clarify that Mr. Hardin is not on trial for any violation of a registered sex offender . . . and to clarify that it's a misdemeanor sex offense, although he says that in the audio already, uhm, but it has to come in as part of, again, the same transaction, and is proof of motive or intent.
>
> And, frankly, preparation, knowledge, all of those. And truly does also sound in absence and mistake. Because if Mr. Hardin thought that he was not threatening Mr. Terrill, and then was confronted with exactly why Deputy Terrill had issues with it, again, Mr. Hardin tripled down or doubled down

8

on the issue and continued the threatening process, rather than retracting or reversing course.

¶8 The District Court asked Hardin if he wanted to provide a specific cautionary instruction to frame the sex offender evidence "in a way that helps minimize . . . any prejudicial effect." However, Hardin ultimately decided to address the issue in voir dire by asking if anybody felt they were not the best person to be on the jury given that "Hardin was convicted in 2013 of a misdemeanor sex assault." Several jurors were excused for cause. The District Court reminded the jury pool that Hardin was not on trial for the prior offense, "but it was referenced," and so the parties were inquiring "because it's preeminently important that Mr. Hardin is given his due presumption of innocence, and can be treated fairly and impartially throughout the trial until you have heard all of the evidence."

¶9 During Deputy Terrill's testimony, the District Court read the jury a pattern cautionary instruction for other prior acts after Deputy Terrill testified that he learned of Hardin's sex offender status through dispatch. Deputy Terrill testified that he was married and had a daughter, was a "prolific member" at his church, and felt "rage and fear" at Hardin's threats. He explained that he understood Hardin's statements to mean "[t]hat if I proceeded to follow with the—or follow through with the completion of the telephone search warrant that he was going to follow me home from church sometime." Deputy Terrill stated he continued the DUI investigation because he had an obligation to do so, but while he signed up to be a police officer, his "wife and kids did not." Deputy Terrill further testified that he felt "the same way that anybody would feel if, uh, somebody that was a

sex offender said that they were going to follow him home, and commented about them having a beautiful little girl."[1] He also explained he believed Hardin "was trying his best to either intimidate me into not fulfilling my obligations as a peace officer, or that he was going to follow me home. He told me that he had done it to other cops." On cross-examination, Deputy Terrill said it was possible Hardin was saying these things because he was drunk, and that he might recall Hardin's statements as more threatening than they were on the recordings.

¶10 Hardin took the stand and testified. He confirmed he recognized Deputy Terrill, thought he knew where he lived, and had an idea of what his wife looked like. Hardin also testified that he had previously followed a patrol vehicle as an experiment. Regarding his statements to Deputy Terrill, Hardin admitted he could "see how, with everything that's been said, it is a threat, and it's threatening." Hardin testified he was "not justifying [his misdemeanor sex offense], it was a mistake, but, uhm, wasn't so serious as to, like, I'm allowed to live around schools, I'm allowed to be around children." Hardin testified that once Deputy Terrill told him he felt threatened given Hardin's sex offender status, "I figured I should shut my mouth. . . ." When the State noted that Hardin did not shut his mouth, but instead continued to make threats, Hardin explained that he was drunk.

¶11 At the end of the trial, the District Court again read a cautionary instruction regarding other prior acts, explaining that it was related to the misdemeanor sex offense.

---

[1] On the dashcam video of the interaction between Hardin and Deputy Terrill, Hardin did not refer to Deputy Terrill's daughter as "beautiful." During trial, however, Hardin testified that "I'm not threatening you by saying you've got a beautiful daughter, or you've got a beautiful wife[.]"

Hardin did not object to the substance of the cautionary instruction. The jury ultimately convicted Hardin.

¶12 The District Court sentenced Hardin to five years with two years suspended on the count of threats and improper influence and six months for the DUI, to run concurrently. At sentencing, the District Court also ordered Hardin to pay pretrial supervision costs, stating:

> [T]he Court is going to impose the $9,428. Those fees, according to the PSI, were related to lost GPS monitors; broken, damaged equipment; missing chargers, and the like. Our pretrial supervision program only succeeds if people are careful with the equipment that is placed on them, and the Court is going to impose that fee.

> The Court further imposes the cost of the jury trial, which is $3,287.13, as well as the PSI fee in the amount of $50.

¶13 Defense counsel objected, stating Hardin did not "have the ability to pay the jury trial costs, . . . I think the cost of the monitors might be appropriate, but the remaining costs for supervision he just doesn't have the ability to pay." Noting Hardin's recent homelessness, trouble finding employment, and his enrollment to receive SSI disability benefits, the court waived the costs of the jury trial, but explained that "the equipment cost is far different. That's an actual hard cost born by the pretrial supervision program, and I'm not going to waive that $9,428." The written judgment reflected the imposition of the $9,428 in pretrial supervision costs on Hardin.

¶14 Hardin appeals.

11

**STANDARD OF REVIEW**

¶15 District courts have broad discretion in determining the relevance and admissibility of evidence, therefore we review a district court's evidentiary rulings for abuse of discretion. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. A district court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Derbyshire*, ¶ 19. To the extent an evidentiary ruling is based on an interpretation of an evidentiary rule or statute, our review is de novo. *State v. Lake*, 2022 MT 28, ¶ 23, 407 Mont. 350, 503 P.3d 274.

¶16 We review "sentencing conditions, fines, and fees 'first for legality, then for abuse of discretion as to the condition's reasonableness under the facts of the case.'" *State v. Steger*, 2021 MT 321, ¶ 7, 406 Mont. 536, 501 P.3d 394 (quoting *State v. Ingram*, 2020 MT 327, ¶ 8, 402 Mont. 374, 478 P.3d 799). In determining legality, we consider "whether the district court followed the affirmative mandates of the applicable sentencing statutes." *Steger*, ¶ 7 (citation omitted).

**DISCUSSION**

¶17 *1. Did the District Court abuse its discretion when it admitted evidence of Hardin's prior sex offense?*

¶18 Hardin argues that the District Court abused its discretion by admitting evidence of his sex offender status. Hardin asserts that the evidence was not admitted for any appropriate purpose under Rule 404(b), such as motive, absence of mistake, knowledge, intent, or identity, and was incorrectly admitted under the transaction rule. Hardin also

12

argues the District Court failed to conduct a proper Rule 403 analysis. Hardin maintains that there was no substantial necessity for admitting the evidence when other admissible evidence fulfilled the same purpose; therefore, the sex offender evidence had little probative value, but carried a significant risk of unfair prejudice given the nature of the sex offense charge. Accordingly, Hardin argues the prejudicial evidence should have been excluded pursuant to Rule 403 and that its admission undermined his right to a fair trial. The State maintains the evidence is admissible under the transaction rule and showed Hardin's intent, knowledge, or purpose in making the statements.

¶19 We conclude the District Court did not abuse its discretion when it admitted the evidence of Hardin's sex offender status under the transaction rule. The transaction rule is codified in § 26-1-103, MCA, and provides that when a declaration "forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration . . . is evidence as part of the transaction." Under this rule, evidence of a declaration that is "inextricably linked or intertwined" with the charged criminal conduct "may be admissible . . . if 'explanatory of a fact in dispute' and thus relevant to 'provide a comprehensive and complete picture'" of the conduct. *Lake*, ¶ 45 (quoting *State v. Guill*, 2010 MT 69, ¶ 36, 355 Mont. 490, 228 P.3d 1152). However, evidence to be admitted pursuant to the transaction rule must be "intrinsic to" or "inextricably intertwined" with the charged conduct and not merely evidence that provides context for the offense. *State v. Sage*, 2010 MT 156, ¶ 39, 357 Mont. 99, 235 P.3d 1284.

13

¶20 "Admissibility under the transaction rule is predicated on the jury's right to hear what [transpired] immediately prior and subsequent to the commission of the offense charged, so that they may evaluate the evidence in the context in which the criminal act occurred." *State v. Michelotti*, 2018 MT 158, ¶ 13, 392 Mont. 33, 420 P.3d 1020 (internal quotation marks omitted; citation omitted). Additionally, this evidence is admissible because "it is theoretically difficult to subdivide a course of conduct into discrete criminal acts and 'other' conduct and . . . it is difficult for a witness to testify coherently to an event if the witness is only permitted to reference the minutely defined elements of the crime." *Guill*, ¶ 27.

¶21 Hardin argues that evidence of his sex offender status is not sufficiently intertwined with the improper threats charge because Deputy Terrill's interpretation of Hardin's statements as threats is not an element of the offense. However, under § 45-7-102(1)(a)(i), MCA, Hardin committed the offense of threats and other improper influence if he purposely or knowingly "threaten[ed] harm to any person, the person's spouse [or] child, . . . or the person's property with the purpose to influence the person's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant. . . ." Thus, Deputy Terrill's interpretation of Hardin's threats was relevant to whether Deputy Terrill would decide a blood draw or further DUI investigation was necessary.

¶22 The District Court noted in its ruling on the sex offense evidence that it was mindful of the potential impact the evidence could have on the jury. The court then noted that after reviewing the audio, Deputy Terrill warned Hardin three times that he perceived Hardin's

14

statements as threats and only during the third warning did Deputy Terrill explain he felt threatened because Hardin said he would follow him home, he knew his wife, knew he had a daughter, and that he knew Hardin was a sex offender. The District Court then explained that had the discussion ended there, it would have excluded the sex offender statement. However, "if Mr. Hardin thought that he was not threatening Mr. Terrill, and then was confronted with exactly why Deputy Terrill had issues with it, again, Mr. Hardin tripled down or doubled down on the issue and continued the threatening process, rather than retracting or reversing course." Consequently, the District Court concluded that the sex offender statements had to come in as part of the same transaction, in addition to other relevant theories of admissibility under Rule 404(b), such as absence of mistake and knowledge.

¶23 As the District Court found, the sex offender statements helped establish that Hardin's statements were indeed threats. Hardin first threatened Deputy Terrill that "I'll see you at Zootown [church]. I'll follow you home one day." Deputy Terrill responded by warning Hardin to "be very careful making threats like that. Cus' you don't know where I live" to which Hardin interjected by saying he already knew where Deputy Terrill lived, and what his wife looks like since he had gone to church with Deputy Terrill. Once again Deputy Terrill warned Hardin "you don't want to go there," but Hardin repeated his threats, adding that he knew Deputy Terrill had a child, "I believe a little girl, if I remember correctly. But I've got a little girl too. So I wouldn't, it's not like I'm making any threats." Therefore, only after Hardin denied he was making threats and referenced Deputy Terrill's

15

daughter did Deputy Terrill inform Hardin he was "absolutely making threats." Hardin asked Deputy Terrill to explain how he was making threats, and Deputy Terrill responded he felt threatened because Hardin said he would follow him home, knew who his daughter was, and that Hardin was a sex offender. Then, knowing exactly why Deputy Terrill felt threatened, Hardin continued making the same threats as before.

¶24 The sex offender evidence helped show Hardin's threats were intentional, particularly after Hardin denied his statements were threats, questioned why Deputy Terrill interpreted the statements as threats, and then tripled down on the threats while framing his statement that he would follow Deputy Terrill home as "free rights" and asserting that "[y]ou can't pull me over for that." Hardin stated that he had followed other officers home but was not pulled over, potentially suggesting once again that such an action was a valid exercise of his "free rights" to go where he wanted. Moreover, Deputy Terrill testified that this interaction with Hardin was unlike regular interactions during his patrol where people threaten him; here, Hardin referred to his daughter. Thus, the sex offender statements helped the jury understand Hardin's intent, the true extent of Hardin's threats, and provided context for why Hardin's threats were unlike those levied at Deputy Terrill on a regular basis. As a result, the District Court did not abuse its discretion in ruling that the sex offender evidence could be admitted under the transaction rule. The statements were inextricably intertwined with the charged conduct that Hardin made improper threats to Deputy Terrill.

16

¶25 Evidence admissible under the transaction rule may still be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." Hardin argues that the District Court failed to assess the sex offender evidence's probative value, instead concluding that the evidence could come in simply because it was relevant to an admissible purpose. Hardin argues the evidence had little probative value because there was no substantial necessity for it when other, less prejudicial evidence proved the same point. Specifically, Hardin asserts that Deputy Terrill told Hardin he felt threatened by Hardin's statements because of the content of the statements themselves as well as Hardin's sex offender status. Therefore, according to Hardin, the sex offender evidence was not necessary to show Deputy Terrill felt threatened and that Hardin, despite knowing how his statements were being perceived, continued to make the threats.

¶26 It was within the District Court's discretion to determine if the danger of unfair prejudice substantially outweighed the probative value of the sex offender evidence. *See* *State v. Sayler*, 2016 MT 226, ¶ 14, 384 Mont. 497, 380 P.3d 743. As discussed above, the sex offender evidence was probative of Hardin's mental state, demonstrating that he continued making threats despite understanding how Deputy Terrill was interpreting his words, and that contrary to his assertion during the interaction, he was not merely stating he had the right to go where he pleased. Even if, as Hardin argues, the probative value of the sex offender evidence was discounted because Hardin's statements that he would follow Deputy Terrill home were sufficient on their own, a district court must still consider "the proponent's 'need for evidentiary richness[,] . . . narrative integrity,' and prerogative

in choosing what evidence to present in support of that party's burden of proof." *Lake*, ¶ 41 (quoting *Old Chief v. United States*, 519 U.S. 172, 183-84, 117 S. Ct. 644, 651-52 (1997)).

¶27    Further, the District Court limited the prejudicial nature of the evidence by twice instructing the jury not to use the sex offender evidence for impermissible propensity purposes. *See State v. Haithcox*, 2019 MT 201, ¶ 21, 397 Mont. 103, 447 P.3d 452 ("[A] limiting instruction generally cures any unfair prejudice."). Hardin declined to offer a cautionary instruction of his own, instead opting to address the sex offense in voir dire. And during voir dire, the District Court advised the jury pool that Hardin was not on trial for the prior sex offense.

¶28    Considering the evidence's probative value and limited risk of unfair prejudice, we conclude that the District Court did not abuse its discretion under Rule 403 by admitting evidence of Hardin's prior sex offense.

¶29    *2.    Did the District Court err by imposing pretrial supervision costs without considering Hardin's ability to pay?*

¶30    The District Court imposed $9,428 in pretrial supervision costs at sentencing, which defense counsel objected to, stating Hardin did not have the ability to pay. The court acknowledged Hardin's homelessness, SSI benefits, and difficulty finding employment, and waived "the cost of the jury fee," but nevertheless imposed the remaining costs. On appeal, Hardin argues—and the State concedes—that the District Court erred when it imposed over $9,000 in pretrial supervision costs without determining whether Hardin

18

lacked the ability to pay the costs, as required by § 46-18-232(2), MCA. As a result, Hardin asks that this Court strike the requirement that he pay pretrial supervision costs.

¶31 We agree with the parties that the District Court erred when it imposed $9,428 in pretrial supervisions costs without considering Hardin's ability to pay. Section 46-18-232(1), MCA, allows a district court to require a defendant to pay the "costs of jury service, costs of prosecution, and the cost of pretrial . . . supervision." However, when imposing those costs, a district court must consider the defendant's ability to pay, "tak[ing] into account the financial resources of the defendant, the future ability of the defendant to pay costs, and the nature of the burden that payment of costs will impose." Section 46-18-232(2), MCA. While the District Court conducted an ability-to-pay analysis and recognized Hardin's limited resources when it waived the costs of the jury trial, it then incorrectly imposed the pretrial supervision costs without considering Hardin's resources, concluding that supervision costs were "far different" than jury trial costs. However, both jury trial costs and supervision costs are subject to the same statutory ability-to-pay analysis.

¶32 It is clear a sentencing court must question and determine the defendant's ability to pay fines, fees, surcharges, and costs prior to their imposition. *State v. Reynolds*, 2017 MT 317, ¶ 22, 390 Mont. 58, 408 P.3d 503. A court must examine the fee considering a defendant's other financial obligations, employment opportunities, available assets, and any present or future hardship imposing the fee may have. *State v. Hotchkiss*, 2020 MT 269, ¶¶ 23-25, 402 Mont. 1, 474 P.3d 1273. Here, the District Court considered that Hardin

19

was unemployed, homeless, and was receiving SSI benefits when it conducted an ability-to-pay analysis regarding the imposition of jury trial costs. An identical analysis applies to pretrial supervision costs. The District Court's inquiry and findings that Hardin was homeless, unemployed, and receiving SSI benefits was adequate when it concluded that Hardin did not have the ability to pay jury trial costs and, likewise, establishes that Hardin does not have the ability to pay pretrial supervision costs. The only distinction between the two made by the District Court was that monitoring costs were "different." Accordingly, we conclude an adequate ability-to-pay analysis was made as to *costs* and remand to the District Court for the limited purpose of striking the $9,428 in pretrial supervision costs from Hardin's sentence.

## CONCLUSION

¶33   Affirmed in part and reversed in part.

/S/ LAURIE McKINNON

We Concur:

/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE

20

Justice Dirk Sandefur, dissenting.

¶34 I dissent from the Majority holding that the District Court correctly allowed the State to present evidence regarding Hardin's prior child sex offense conviction as evidence that he committed the charged offense of threatening to harm a law enforcement officer in violation of § 45-7-102(1)(a)(i), MCA. As charged here, the subject offense merely required the State to prove beyond a reasonable doubt that Hardin: (1) purposely or knowingly threatened to harm the subject police officer, his spouse, and/or his child, and (2) with the purpose to influence the officer's discretionary decision to transport him for a non-consensual DUI investigatory blood sample pursuant to a previously issued court order. *See* § 45-7-102(1)(a)(i), MCA. As manifest in the excerpt transcribed from the officer's patrol car audio-video recording viewed and heard by the jury at trial, Hardin unmistakably, without any reasonable question, made repeated statements implicitly threatening to harm the officer, his spouse, and his minor daughter for the manifest purpose of deterring him from proceeding with the non-consensual DUI draw of Hardin's blood. The Majority makes no attempt to justify or otherwise affirm the District Court's stated M. R. Evid. 404(b) justification for allowing the officer to testify regarding his knowledge of Hardin's prior child sex offense conviction as echoed by the State on appeal: to show the reasonableness of the officer's "fear" that Hardin would actually attempt to carry-out his threats. The reasonableness of the officer's fear is not a required element of proof of the subject offense as charged.

¶35 Moreover, while the transaction rule cited by the Majority indeed contemplates admission of what Hardin in fact said to the officer at the time of making the subject threats, and which might not be otherwise admissible, the statutory rule applies *only when* the otherwise inadmissible evidence is *actually relevant* under M. R. Evid. 401-02 to provide the complete context of the occurrence of the charged offense *if and when "explanatory of a fact in dispute." State v. Lake*, 2022 MT 28, ¶ 45, 407 Mont. 350, 503 P.3d 274 (emphasis added). Proffered evidence is relevant only to the extent that it "tend[s] to make the existence of [a] fact . . . of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. "Evidence which is not relevant is not admissible." M. R. Evid. 402.

¶36 As a threshold matter, the Majority puts forth *no reasonable explanation* as to how or on what logical basis the officer's knowledge of Hardin's prior sex offense conviction tended to make it more likely than not that he intended the subject statements as threats of harm, rather than for some other unexplained reason. In context, Hardin clearly and unquestionable made the subject threatening statements in response to the officer's stated intent to subject him to an investigatory DUI blood draw. Both elements of the charged offense were readily provable based on the undisputed circumstances of the encounter, and the clearly implicit threats repeatedly made by Hardin, without any need whatsoever for reference to the fact that he was a prior sex offender. The Majority's unexplained cursory assertion notwithstanding, the fact that Hardin was a convicted sex offender neither helped explain the circumstances under which he made his threatening statements, nor helped

22

demonstrate their threatening nature, his threatening purpose, or his knowledge or awareness of their threatening nature. Neither the fact of Hardin's prior sex offense conviction, nor the officer's awareness of that fact, had any probative value whatsoever to *any pertinent fact at issue*, whether as transaction rule evidence or otherwise. Thus, reference to Hardin's prior sex offense conviction was not even admissible as a threshold matter under M. R. Evid. 401-02.

¶37 Moreover, even when otherwise inadmissible evidence may be relevant under the transaction rule and Rules 401-02 to explain the circumstances of the charged offense, the otherwise relevant transaction evidence is still not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice." M. R. Evid. 403. Not much, if anything, is more unfairly prejudicial to a supposedly presumed-innocent criminal defendant in a jury trial on an unrelated offense than ancillary evidence that he is a prior sex offender, and thus a person of inherently bad and offensive character in the public eye.

> The need and demand for careful consideration and application of Rule 403 is particularly critical in the case of other bad acts evidence because, even when otherwise validly admissible for a [relevant] purpose, such evidence is inherently prejudicial insofar that it impugns or has the tendency to impugn the character of the accused based on matters not directly at issue, thus arousing or provoking hostility against him or her without regard to its probative value, thereby inviting or tempting the jury to find guilt on an improper basis. . . . This inherent danger is even more acute when the other bad acts evidence pertains to [a sex offense].

*Lake*, ¶ 32 (in re prejudicial reference to arguable child sexual abuse proclivity of attempted deliberate homicide defendant—internal citations omitted). *See also State v. Sage*, 2010 MT 156, ¶¶ 36-37, 357 Mont. 99, 235 P.3d 1284 ("courts must . . . exercise great caution

when" allowing use of "potentially inflammatory" evidence of a sexual nature even when admitted for some other limited legitimate purpose such as under the transaction rule). While we have recognized that a cautionary instruction under M. R. Evid. 105 *may* be sufficient to offset the risk of *unfair* prejudice if the probative value of the otherwise inherently prejudicial evidence is high as proof of a fact actually at issue, the cautionary instruction here was simply not sufficient to fairly offset the inherently prejudicial nature of Hardin's prior sex offense conviction in the context of this case where it had no probative value whatsoever to any pertinent fact at issue under the elements of the charged offense— absolutely none. I dissent.

/S/ DIRK M. SANDEFUR